**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 3 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

KENNETH EATON; JANET PRICE;
PATRICIA MCCLELLAN,

      Plaintiffs-Appellees,

v.

DAVID MENELEY,

      Defendant-Appellant,

  and

SHAWNEE COUNTY, KANSAS,

      Defendant.

No. 03-3215

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. Nos. 01-CV-2097-KHV and 01-CV-2098-CM)**

---

Submitted on the briefs:

Ron D. Martinek of Parker & Hay, LLP, Topeka, Kansas, for
Defendant-Appellant.

Robert V. Eye of Irigonegaray & Associates, Topeka, Kansas, for
Plaintiffs-Appellees.

---

Before **EBEL**, **ANDERSON**, and **BRISCOE**, Circuit Judges.

**EBEL**, Circuit Judge.

Defendant-appellant David Meneley, the former sheriff of Shawnee County, Kansas, appeals the district court's denial of his defense of qualified immunity.[*] Plaintiffs-appellees Janet Price, Patricia McClellan, and Kenneth Eaton brought suit against Meneley under 42 U.S.C. § 1983 and various state statutes for allegedly violating their First Amendment rights by misusing his position as sheriff to defeat their petition drive to have him removed from office. Meneley had run the plaintiffs' names through a computer system available only to law enforcement personnel to discover if they had criminal records. When the plaintiffs disseminated the information that Meneley had run their names through the system, the plaintiffs' supporters deserted them and the petition drive failed. Meneley was later removed from office, though, when the Kansas courts found that he had given false testimony on two occasions. See State ex rel. Stovall v. Meneley, 22 P.3d 124, 132, 150 (Kan. 2001).

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

The district court here initially ruled that Meneley was entitled to qualified immunity because the plaintiffs had not produced sufficient evidence that their First Amendment rights to political expression and free association had, in fact, been chilled. See Aplt. App., Vol. II at 545-46. The court noted that the plaintiffs had continued to organize the petition drive after Meneley had run their names, and they had continued to participate vigorously in public debate. Id. But the district court reversed itself on reconsideration in light of the plaintiffs' argument that it should have used the objective standard for evaluating harms articulated in our First Amendment retaliation cases. See id., Vol. III at 592-96 (citing Worrell v. Henry, 219 F.3d 1197, 1212-13 (10th Cir. 2000)). On reconsideration, the district court found that Meneley's abuse of his official position in running the plaintiffs' names was actionable under the retaliation cases because it should have chilled a person of ordinary firmness from engaging in protected political expression. Id. at 594-96.

We have jurisdiction to hear appeals of the denial of qualified immunity when they turn on an issue of law. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). We hold that the district court on reconsideration used the proper objective standard of First Amendment retaliation cases to evaluate the plaintiffs' claims, but we disagree with its conclusion that Meneley's single action in running the background check would have chilled the speech of a person of ordinary firmness

engaged in political debate. We reverse the district court's denial of qualified immunity and remand for further proceedings consistent with this decision.

Background

In evaluating a defendant's assertion of qualified immunity, we view the evidence in the light most favorable to the plaintiffs as the non-moving party. See DeSpain v. Uphoff, 264 F.3d 965, 971 (10th Cir. 2001); Patrick v. Miller, 953 F.2d 1240, 1243 (10th Cir. 1992).

In March 1999, plaintiffs Price, McClellan, and Eaton organized a petition to recall Meneley for alleged misconduct in office. See Aplt. App., Vol. II at 535-36. Price at the time told the local newspaper, the Topeka Capital-Journal, that more than 100 individuals were willing to sponsor the recall. Id.

In early April 1999, Price discovered through a contact at the Shawnee County Sheriff's Department that Meneley had run the names of the three plaintiffs, as sponsors of the recall petition, through the department's criminal history check system (the Interstate Identification Index, or "III" system). Id. at 536. Price contacted the Topeka Capital-Journal and the Kansas Bureau of Investigation (the KBI) to report that Meneley had run her name through the system. Id. McClellan also spoke to the newspaper about having her name run through the computer. Id.

Soon afterwards, the Topeka Capital-Journal printed a story about how the KBI was investigating the Sheriff Department's use of the criminal history system to run the names of recall petition sponsors. Id. The Sheriff's Department, through a spokesman, confirmed that it had run the background checks, but stated that it had acted on a tip that the recall petition sponsors had felony records. Id. The Department acknowledged, however, that none of the recall petition sponsors had ever been convicted of a felony. Id. at 537.

When interviewed by the KBI, Meneley reasserted that he had run the sponsors' names on the basis of an anonymous tip, but he could produce no notes or other documentation to support his claim. Id. at 537-38. KBI agents later testified that, if Meneley had received such an anonymous tip, he should have turned the tip over to an independent law enforcement agency for investigation to avoid a conflict of interest. Id. at 538.

Not long after the Topeka Capital-Journal article on the background checks ran, sponsors of the petition began to withdraw from the movement for fear of retaliation from the sheriff. Id. at 539. McClellan testified that about forty sponsors dropped their names from the petition, some sponsors solicited signatures less enthusiastically, and other sponsors refused to turn in their petition lists because signatories did not want their names to be made public. Id. Eaton confirmed that supporters of the drive told him that they were concerned about

signing the petition because they feared that their criminal histories would be checked.   Id. at 540.  Also, as evidence of how widespread the negative reaction was, Eaton testified that, when he first learned of the background checks, even he assumed that there had been a legitimate basis for the checks, and he had become leery of the other sponsors.     Id.

In June 1999, it became clear that the recall petition drive would fall short of the number of signatures it needed to be successful.      Id. at 541.  The recall movement required 29,000 signatures to put Meneley's removal to a vote, and the plaintiffs had been able to collect only approximately 15,000 signatures.      Id. Price then destroyed the signature sheets as she had promised numerous signatories to protect them from possible retaliation from Meneley.      Id.; id. n.12.

Finally, the plaintiffs allege various personal injuries as a result of the III check, independent of the general failure of the petition drive.  Price testified that discovery of the III checks had caused her stress, and that she had cried for several months and become depressed.     Id. at 541.  McClellan testified that news of the III checks had harmed her reputation in the community.      Id.  Eaton, who is a detective with the Topeka Police Department, testified that the alleged running of a III check on him damaged both his personal and professional reputations.      [1]

---

[1]     There is some debate in the record whether a III check was actually run on Eaton, but the newspaper, the plaintiffs, and the wider community reported and
(continued...)

Id. at 541-42. He also testified to feeling humiliated, slandered, and embarrassed by the process. Id. at 542. And he has lost confidence in the justice system because he believes that Meneley has felt no formal repercussions for his abuse of the III system. Id.

Standard of Review

Because the application of qualified immunity is a question of law, we review the district court's decision de novo. See, e.g., Walter v. Morton, 33 F.3d 1240, 1242 (10th Cir. 1994). We also employ the de novo standard to scrutinize a defendant's actions whenever a plaintiff's activity is protected by the First Amendment. Lytle v. City of Haysville, 138 F.3d 857, 862 (10th Cir. 1998). We have the duty to conduct "an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Id. (quotation omitted).

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Under our two-part test for evaluating qualified immunity, the plaintiff must show (1) that

---

[1](...continued)
believed that one had been run on him along with the other petition sponsors.

the defendant's conduct violated a constitutional or statutory right, and (2) that the law governing the conduct was clearly established at the time of the alleged violation. Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1255 (10th Cir. 1998); accord Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 516 (10th Cir. 1998). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Unless both prongs are satisfied, the defendant will not be required to "engage in expensive and time consuming preparation to defend the suit on its merits." Siegert v. Gilley, 500 U.S. 226, 232 (1991).

But if a plaintiff fails to demonstrate that a defendant's conduct violated the law, the court need not determine whether the law was clearly established. Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993). Our threshold analysis thus focuses on determining "first whether the plaintiff has alleged a deprivation of a constitutional right at all." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). For there to have been a violation of First Amendment rights, the defendant's action must have had a deterrent, or "chilling" effect on the plaintiff's speech. See, e.g., Waters v. Churchill, 511 U.S. 661, 669 (1994). And when the plaintiff alleges that the defendant's action was taken in retaliation for protected speech, our standard for evaluating that chilling effect on

speech is objective, rather than subjective. Smith v. Plati, 258 F.3d 1167, 1176-77 (10th Cir. 2001). The harm must be of the type that would chill a person of ordinary firmness from continuing to engage in the protected speech. Worrell, 219 F.3d at 1212-13. Thus, although the objective standard permits a plaintiff who perseveres despite governmental interference to bring suit, "a trivial or de minimis injury will not support a retaliatory prosecution claim." Poole v. County of Otero, 271 F.3d 955, 960 (10th Cir. 2001).

Discussion

Because of how this case has been argued, we address briefly three preliminary issues before we analyze the qualified immunity question.

First, neither party debates that the plaintiffs have established standing to bring their First Amendment claims in their own right. The plaintiffs were individually the targets of alleged government misconduct, and they assert individual harms from the running of the III check, not harms merely as third-party representatives of other supporters who deserted the petition drive. See, e.g., Meese v. Keene, 481 U.S. 465, 472-77 (1987) (holding that harm to reputation is a cognizable injury for standing in First Amendment retaliation cases); Riggs v. City of Albuquerque, 916 F.2d 582, 584-86 (10th Cir. 1990) (recognizing standing where the plaintiffs were the actual targets of illegal surveillance and where they alleged harms to their personal and professional

reputations). Because there is no debate over whether the plaintiffs here have standing, we also need not be further concerned about the precedential weight of Riggs, which the parties quote at length. Although Riggs involved facts similar to this case, our decision in Riggs exclusively discussed the issue of standing, and therefore does not provide guidance in evaluating the next question whether the merits of the plaintiffs' claim should survive the application of qualified immunity. The test for a plaintiff to establish standing to bring a claim is specifically separate from the test the plaintiff's allegations must pass to establish the claim itself. See Phelan v. Laramie County Cmty. Coll. Bd. of Trs., 235 F.3d 1243, 1247 n.1 (10th Cir. 2000) (emphasizing that although an alleged harm to reputation may be sufficient to establish standing, it may not be enough to establish an abridgement of free speech rights); cf. also generally United States v. Torres, 182 F.3d 1156, 1164 n.2 (10th Cir. 1999) (reiterating the importance of considering only issues in the case before us).

Second, although the plaintiffs make much of the fact that running their names through the III system violated Sheriff Department policy and official III guidelines, see Aplt. App., Vol. II at 546; Aplt. Br. at 14, those potential violations of local codes are not issues before us when considering qualified immunity under § 1983. We evaluate the plaintiffs' arguments only for whether there are allegations sufficient to support the finding of a federal constitutional

or statutory violation, here of the First Amendment. See, e.g. , Harlow , 457 U.S. at 818; Tonkovich , 159 F.3d at 516.

Third, although the plaintiffs assert that questions of fact remain about Meneley's actual motives in running the III check, that argument does not touch upon our jurisdiction in this matter. Aplee. Br. at 1. Even if issues of fact exist, we have jurisdiction because we inquire only into the legal question whether Meneley's conduct, as alleged by the plaintiffs and as construed in the light most favorable to them, would violate constitutional law. See, e.g. , Gross v. Pirtle , 245 F.3d 1151, 1156-57 (10th Cir. 2001) (discussing circumstances under which this court has jurisdiction to review the denial of qualified immunity despite the existence of disputed facts).

Finally, we are able to turn to the central issue in the case against Meneley on qualified immunity, which is whether the plaintiffs' allegations, as construed in the light most favorable to them, would establish a violation of their constitutional rights. Although we strongly disapprove of Meneley's conduct in running the background check on the plaintiffs, we hold that this single action was not enough to chill the actions of persons of ordinary firmness who enter the arena of political debate to sponsor a recall petition against a sheriff who they accuse of abusing his office. We reaffirm with this decision that the objective standard of a person of ordinary firmness is a vigorous standard; although the

standard permits a plaintiff who perseveres despite serious injury from official misconduct to assert a constitutional claim, it is substantial enough that not all insults in public debate become actionable under the Constitution. See Poole, 271 F.3d at 960.

Our case law recognizes that the nature of political debate is rough and tumble. Plaintiffs in public debates are expected to cure most misperceptions about themselves through their own speech and debate. For example, in the case of Phelan v. Laramie County Community College Board of Trustees, 235 F.3d 1243 (10th Cir. 2000), we held that a member of a college board could not sustain an action for alleged violation of her First Amendment rights when the Board publically censured her for campaigning against its decision on an issue because both parties remained free to express their views. Id. at 1248. Even in the context of that First Amendment retaliation case, we wrote that "injury to one's reputation is not enough to defeat constitutional interests in furthering 'uninhibited, robust' debate on public issues." Id. at 1248 (citation omitted).

The plaintiffs here remained free to talk to the media about the sheriff's use of the III system, and they did. Aplt. App., Vol. II at 536; see also Schalk v. Gallemore, 906 F.2d 491, 495 (10th Cir. 1990) (noting that most speech focusing on "disclosing public officials' malfeasance or wrongdoing" should be considered a matter of public concern). Indeed, the plaintiffs were the ones to bring the story

-12-

to the newspaper, and they were the ones who repeatedly spoke to the press about how the petition drive was progressing and what message they wanted to give their supporters about the III checks. Despite anything the sheriff had done, the plaintiffs were very much "free to express [their] views publically and to criticize" the sheriff's conduct, as we have found to be significant. Phelan , 235 F.3d at 1248. These plaintiffs have not then stated a claim that would support a finding that their constitutional rights have been violated.

Accordingly, for the reasons stated above, the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this decision.