PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DON BLANKENSHIP,

*Plaintiff-Appellee,*

v.

JOE MANCHIN, III, in his individual capacity and in his official capacity as Governor of the State of West Virginia,

*Defendant-Appellant.*

No. 06-1249

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(2:05-cv-00606)

Argued: October 24, 2006

Decided: December 20, 2006

Before WILKINS, Chief Judge, GREGORY, Circuit Judge, and
James R. SPENCER, Chief United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Spencer joined. Chief Judge Wilkins wrote a separate opinion concurring in the judgment.

## COUNSEL

**ARGUED:** Mitchell Eliot Zamoff, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellant. Robert D. Luskin, PATTON

BOGGS, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Charles R. Bailey, Vaughn Sizemore, BAILEY & WYANT, P.L.L.C., Charleston, West Virginia; Barbara H. Allen, OFFICE OF THE ATTORNEY GENERAL, Charleston, West Virginia; Adam K. Levin, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellant. Patrick J. Slevin, PATTON BOGGS, L.L.P., Washington, D.C., for Appellee.

---

## OPINION

GREGORY, Circuit Judge:

This appeal requires us to determine whether a sitting governor is entitled to qualified immunity for allegedly threatening a political rival and prominent businessman during a press conference concerning a bond issue before West Virginia voters. Because we find that the facts as alleged establish that the governor threatened imminent adverse regulatory action and that a reasonable public official in his position would know that such a threat is unlawful, we hold that the governor is not entitled to immunity from this suit at the motion-to-dismiss stage. Accordingly, we affirm the ruling of the district court.

### I.

This case arises from the controversy surrounding a proposed bond amendment to the West Virginia Constitution, supported by Governor Joe Manchin III ("Manchin" or "the Governor" or "Appellant") and opposed by Don Blankenship ("Blankenship" or "Appellee"). Because this case is on appeal at the motion-to-dismiss stage, the facts are presented largely from Appellee's complaint, with inferences drawn in his favor. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 300 n.3 (4th Cir. 2006).

### A.

Blankenship is the President of Massey Energy, one of the largest coal companies in the nation and the largest in West Virginia. In addition to his corporate employment, Blankenship is an active participant

in West Virginia politics. In 2004, Blankenship campaigned against the reelection of West Virginia Supreme Court Chief Justice Warren McGraw. In early 2005, Blankenship publicly opposed legislation proposed by Manchin that would have increased the coal severance tax and funded workers' compensation benefit plans.

In February 2005, the West Virginia legislature passed a bond amendment to the state constitution. If approved by voters, the amendment would have permitted the sale of over five billion dollars worth of state general-obligation bonds to fund underfunded pension and disability plans for teachers, judges, and other public employees. The amendment was placed before the voters in a special election on June 25, 2005. Blankenship opposed the amendment and began to publicize his opposition through interviews and the financing of television, radio, and direct-mail advertising. The Governor publicly campaigned in support of the amendment, including, according to the complaint, running negative advertisements portraying Blankenship as an outsider and using staff to ask the West Virginia Secretary of State about Blankenship's residence.

On June 17, 2005, the Governor appeared at an American Electric Power plant in Putnam County, West Virginia, in part to promote the bond amendment. After his speech, the Governor took media questions. Blankenship alleges that some of the Governor's answers "threatened [Blankenship] by warning that the government would scrutinize the affairs of [Blankenship] and Massey even more closely in light of [Blankenship's] decision to participate in the public debate over the pension bond amendment." Compl. ¶ 16. The Governor is quoted as remarking, "I think that [additional scrutiny] is justified now, since [Blankenship] has jumped in there [the bond debate] with his personal wealth trying to direct public policy." Compl. ¶ 16 (quoting Ken Ward Jr., *Manchin Still Sparring Over Pension Bond Bid*, Charleston (W.V.) Gazette, June 18, 2005 at 6C).

The following day, the Governor's remarks were reported in the *Charleston Gazette*.[1] The article ("the Gazette Article"), headlined

---

[1]Blankenship did not attach the Gazette article to his complaint. Nonetheless, we may consider the article even at the Rule 12(b)(6) stage, as

"Manchin Still Sparring Over Pension Bond Bid," reported, in relevant part:

> Gov. Joe Manchin continued Friday to spar with Massey Energy President Don Blankenship over the Governor's multimillion-dollar pension bond proposal. The Governor said Blankenship, who has launched a personal campaign against the bond plan, should expect tougher scrutiny of his business affairs.
>
> "I think that is justified now, since Don has jumped in there with his personal wealth trying to direct public policy," Manchin said.
>
> . . .
>
> After his brief speech . . . Manchin was quizzed repeatedly by reporters about his pension bond battle with Blankenship.
>
> In a later interview, Manchin declined to say if he thought Blankenship was "a good corporate citizen."
>
> "I'm not going to sit here and try to rag on anyone," Manchin said.
>
> "I truly appreciate and value every business person who creates jobs in our state," the Governor said. "[But] I want Don to use his creative energies in a good, positive manner."
>
> Manchin said he was puzzled that Blankenship would not agree to serve on a pension bond advisory committee before launching his campaign against the Governor's proposal.

(1) it was attached to Manchin's motion to dismiss, and is clearly integral to, and was relied upon in, Blankenship's complaint; and (2) Blankenship does not dispute its authenticity. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).

"The most frustrating thing going on is that there's a person who has been very successful financially in the business world, and when someone asked him to be a part of a positive movement in West Virginia, he said, 'No.'"

When asked, Manchin said that Blankenship's campaign against the pension bonds should and will prompt even more scrutiny of Blankenship, who is arguably already the state's highest-profile coal executive.

"If you want to throw yourself into public policy, your record is open," the Governor said.

Manchin declined to personally offer any specific criticisms of the way Massey or Blankenship has operated, except to note that the company has had numerous run-ins with state environmental regulators.

"I think there have been many violations that hopefully they've been able to correct," the Governor said.

Ward Jr., *supra*. On June 25, 2005, voters rejected the bond amendment.

Blankenship alleges that in retaliation for his campaign against the amendment, Manchin "used state government resources to reinforce his threat against [Blankenship] and Massey." Compl. ¶ 19. On June 30, 2005, the West Virginia Department of Environmental Protection ("DEP") approved a Massey permit application to build a coal silo in Raleigh County, West Virginia. Despite the approval, Manchin allegedly ordered members of his staff to meet with DEP and other regulatory officials to investigate possible safety concerns with regard to the silo site. Blankenship maintains that the Governor ignored these safety concerns when other groups raised them previously and initiated the investigation "not out of concern for the safety of residents, but instead, in retaliation for [Blankenship's] campaign against the bond amendment." Compl. ¶ 19.

B.

On July 26, 2005, Blankenship commenced this action against Manchin, in his official and individual capacities, alleging that Manchin violated 42 U.S.C. § 1983 by unconstitutionally retaliating against Blankenship. The complaint sought declaratory, injunctive, and compensatory relief, as well as attorneys' fees pursuant to 42 U.S.C. § 1988. In response, Manchin filed a motion to dismiss, alleging that Blankenship's complaint fails to state a claim of retaliatory action in violation of the Constitution; that Blankenship lacks standing to assert the claim; that the claims are barred by qualified immunity; that monetary damages based in Manchin's official capacity are barred by the Eleventh Amendment; and that injunctive relief is inappropriate.[2] On January 18, 2006, the district court denied the motion in all respects, except for dismissing the compensatory damages claim against Manchin in his official capacity.

Rejecting Manchin's qualified immunity argument, the district court began by noting that First Amendment retaliation claims are governed by this Court's decision in *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000), where we elucidated a three-part test for evaluating First Amendment retaliation claims against a public official. The district court characterized the relationship between Manchin and Blankenship as "best exhibited by the fact that the industry in which the [Appellee] finds himself is also one over which the state exercises robust oversight powers." *Blankenship v. Manchin*, 410 F. Supp. 2d 483, 492 (S.D. W. Va. 2006).

The district court then concluded that the complaint adequately alleged threats suggesting imminent adverse regulatory action because of Manchin's remarks that Blankenship justifiably should expect tougher scrutiny of his business affairs. In addition, the district court noted that discovery would reveal whether Manchin's actions in ordering his staff to meet with DEP officials was an accompanying act of retaliation against Appellee. Taking these factors together, the

---

[2]In addition, in his reply memorandum in support of his motion to dismiss, Manchin argued that the district court should abstain under the doctrine announced in *Younger v. Harris*, 401 U.S. 37 (1971). This issue is not before this Court at the present time.

district court held that the alleged threats and retaliatory conduct would deter a person of ordinary firmness from exercising her First Amendment rights.

Further, relying on this Court's decisions in *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001), and *Suarez*, the district court held that a reasonable governor would have known that Manchin's alleged actions violated clearly established law. Finding a constitutional violation of a clearly established right, the district court denied the application of qualified immunity. This appeal followed.

## II.

This Court has appellate jurisdiction to consider the district court's denial of qualified immunity "to the extent that the [Appellant] maintains that [his] conduct did not violate clearly established law." *Winfield v. Bass*, 106 F.3d 525, 529 (4th Cir. 1997) (en banc). We review a district court denial of a motion to dismiss on the basis of qualified immunity de novo, "accepting as true the facts alleged in the complaint and viewing them in the light most favorable to the plaintiff." *Ridpath*, 447 F.3d at 306; *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997) (en banc).

The inquiry into whether a defendant can assert qualified immunity proceeds in two steps. First, the court must determine if the pleaded facts demonstrate that the defendant's conduct violated a constitutional right. *Ridpath*, 447 F.3d at 306. If the facts do not establish the violation of a right, qualified immunity will apply, and the motion to dismiss on that basis should be granted. If a violation is established, "the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

## A.

We first turn to the issue of whether Blankenship has properly alleged a constitutional violation. This Court set forth the three-part standard for pleading a First Amendment § 1983 retaliation claim in *Suarez*. 202 F.3d at 686. First, the plaintiff must demonstrate that his speech is protected. *Id.* Next, "the plaintiff must demonstrate that the

defendant's alleged retaliatory conduct adversely affected the plaintiff's constitutionally protected speech." *Id.* Finally, the plaintiff must show "a causal relationship . . . between its speech and the defendant's retaliatory action." *Id.*

In this case, the first and third elements are not in dispute.[3] Rather, because the alleged retaliation is in the nature of speech,[4] we must first determine whether Manchin's remarks were "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow." *Id.* at 689. Given the procedural posture of this case, in order for us to conclude that Manchin did not violate Blankenship's rights, we must conclude that Blankenship could prove no set of facts to support his claim that Manchin threatened imminent adverse regulatory action under *Suarez*. *See Ridpath*, 447 F.3d at 317. The available evidence, including the account of the Governor's remarks in the Gazette Article, does not allow us to reach such a conclusion.

To begin, we note that the Gazette Article is only one account of Manchin's remarks on June 17, 2005. Thus, even if Manchin's quoted remarks did not amount to a threat of imminent adverse regulatory action, Blankenship could still prove that Manchin made threats at the press conference that went unquoted in the Gazette Article and avoid dismissal at the 12(b)(6) stage. Because we find that Manchin's

---

[3]We agree with Appellant regarding the portions of the complaint that discuss the Governor's ordering his staff to meet with DEP officials regarding Massey permits. These incidents are not separate instances of retaliation, but rather are encompassed within the alleged threat of the Governor to scrutinize the Appellee's business affairs. In other words, these claims are not viable independent of the Governor's alleged threats. We may, however, consider these incidents in our determination of whether the Governor's remarks constituted a threat of imminent adverse regulatory action. Because we do not view Manchin's actions with regard to the DEP investigation as the basis for an independent § 1983 claim, we need not address whether the heightened pleading standard announced in *Hartman v. Moore*, 126 S. Ct. 1695 (2006), would apply to such a claim.

[4]The *Suarez* rule does not apply where the retaliatory speech discloses private or damaging information about the plaintiff. *See Suarez*, 202 F.3d at 688.

quoted remarks in the Gazette Article did threaten imminent adverse regulatory action, we need not analyze Blankenship's allegations without the aide of the Gazette Article.

Appellant urges this Court to consider the full context of the Governor's remarks, especially the placement of the article at page C6 of the newspaper, in determining whether the remarks threatened imminent adverse regulatory action under *Suarez*. While we must examine the full context of the newspaper article in which Appellant's statements appeared, we read the statements in the light most favorable to Appellee and draw any reasonable inferences in his favor. *See Ridpath*, 447 F.3d at 315 n.23. We must accept the allegations in the complaint regarding the implication of Manchin's statements, unless they represent "unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000), or "contradict matters properly subject to judicial notice or by exhibit," *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). We follow this approach not because we read the Gazette Article with a "cynical eye," as the Appellant alleges, but because this approach is proper under Rule 12(b)(6).

We cannot draw the inference from the placement of the article in the Gazette that the Governor's remarks were not threats. To begin, this case is not one for defamation, where the newspaper article itself represents the alleged tort. Thus, although the article is helpful insofar as it provides one account of Manchin's remarks, which we may consider in determining whether those remarks satisfy *Suarez*, it is not the sole focus of our inquiry, as noted above. Second, while we may take judicial notice of the general proposition that newspapers tend to place important stories on their front pages, there is no evidence in the record indicating why the Gazette Article was placed at page C6. Such a matter is one that can be inquired into during discovery, but is not proper at this stage of the proceedings, especially because it would require us to draw an inference *against* the Appellee, contrary to our standard of review.

Appellant's explanation for his remarks is that they were a prediction and an opinion that Blankenship's public involvement in the bond amendment election would invite increased scrutiny from the media and the public. This explanation fails. It is a reasonable reading

of Manchin's remarks to view them as a threat of imminent adverse regulatory action against Massey, rather than a prediction about how the media and the public would view Blankenship's affairs. For example, at the time of the Governor's alleged remarks, Blankenship was not a political novice, having spent upwards of two million dollars to defeat a state Supreme Court Justice in 2004 and having fought a campaign against Manchin's 2005 worker's compensation reform legislation. Because Blankenship was a veteran of West Virginia politics and had already participated in two contentious campaigns, it is unreasonable to conclude that the only reading of Manchin's remarks is that they were a warning to Blankenship that his opposition of the bond referendum would result in increased scrutiny by the public and the media.

Furthermore, the actual regulatory scrutiny that Massey experienced shortly after the article appeared strongly supports interpreting Manchin's remarks as a threat of increased regulatory scrutiny. That Manchin activated the "punitive machinery of the government" against Massey supports our reading the Governor's remarks as threats, rather than predictions. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003).

Unlike a statement of opinion, the Governor's remarks went beyond "reflecting [his] own views and intent." *The Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 421 (4th Cir. 2006). The "tougher scrutiny" of his business affairs that Manchin said Blankenship should expect and that would be "justified," intimated that Massey would receive more scrutiny from state regulators than other, similarly situated companies. "Given the expertise of agencies in the fields they regulate, a presumption of regularity attaches to administrative actions." *Cent. Elec. Power Co-op., Inc. v. Se. Power Admin.*, 337 F.3d 333, 337 (4th Cir. 2003); *accord Preston Memorial Hosp. v. Palmer*, 578 S.E.2d 383, 387 (W. Va. 2003) ("We proceed . . . to determine whether the lower court abused its discretion in reaching a decision which sets aside the presumption of regularity generally accorded an administrative agency's decision by a reviewing court."). Tougher scrutiny by agencies whose actions are afforded a presumption of regularity is adverse regulatory action, because it implies harsher, or at least disparate, treatment of Massey as a direct result of Blankenship's political speech. *Cf. Garcia*, 348 F.3d at 728 ("Mayor Whitaker told Ms. Gar-

cia that the two-hour [parking] time limit would be enforced against her, and that he was taking this action because of her complaints about the bicycling ordinance.").

Because Massey is an industry leader in a heavily regulated industry, we can draw an inference in favor of the Appellee that Massey is subject to near-constant regulatory oversight, and any "additional" scrutiny could be applied immediately. Indeed, the Appellee's complaint supports this conclusion by alleging the actual investigation ordered by the Governor a mere five days after voters rejected the bond amendment. Thus, rather than an opinion or prediction, Manchin's remarks are reasonably construed as threats that, as a result of Blankenship's speech, Massey would be subject to greater regulation than prior to Blankenship's remarks, or than its competitors faced. Such a threat, directed towards an individual who is the head of a company in a highly regulated industry, constitutes an intimation of imminent adverse regulatory action and satisfies *Suarez.*

B.

Having found that Manchin's remarks constituted retaliation under *Suarez*, we undertake an objective inquiry into whether "a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *Baltimore Sun*, 437 F.3d at 416 (citing *Constantine*, 411 F.3d at 500).

In *Suarez*, this Court noted that "determining whether a plaintiff's First Amendment rights were affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." 202 F.3d at 686. This Court has previously characterized the political arena as "rough and tumble," holding that a political reporter of ordinary firmness would not "be chilled by a politician's refusal to comment or answer questions on account of the reporter's previous reporting." *Baltimore Sun*, 437 F.3d at 419 (citing *Eaton v. Meneley*, 379 F.3d 949, 956 (10th Cir. 2004)). Finding the restrictions imposed by the Governor in *Baltimore Sun* to be de minimis, this Court noted that "typical reporters . . . are used to currying their sources' favors." *Id.* In sum, we could not "accept that the

Governor's directive . . . created a chilling effect any different from or greater than that experienced by The Sun and by all reporters in their everyday journalistic activities." *Id.* at 420.

In *Eaton*, the Tenth Circuit noted, "Plaintiffs in public debates are expected to cure most misperceptions about themselves through their own speech and debate." 379 F.3d at 956. Finding that a sheriff's running an unauthorized background check on individuals who publicly advocated for his recall "was not enough to chill the actions of persons of ordinary firmness who enter the arena of political debate," the Eaton court concluded that "[t]he plaintiffs . . . remained free to talk to the media about the sheriff's use of the [background check] system, and they did." *Id.* Similarly, in *Mattox v. City of Forest Park*, the Sixth Circuit noted:

> As an elected public official, Mattox voluntarily placed herself open to criticism . . . . A deliberate attempt to discredit Mattox, especially if initiated in retaliation for her actions in investigating the fire department, is perhaps an inappropriate and unfortunate occurrence, but . . . it is not the type of "adverse action" against which the First Amendment protects. . . . We do not think it would deter a public official of ordinary firmness from exercising his or her right to speak under the First Amendment. Public officials may need to have thicker skin than the ordinary citizen when it comes to attacks on their views.

183 F.3d 515, 522 (6th Cir. 1999).

By contrast, in *Garcia*, a shop owner, Carolyn Garcia ("Garcia"), complained to public officials about lax enforcement of an ordinance prohibiting bike riding on the sidewalk. 348 F.3d at 727-28. Because of her complaints, the mayor told Garcia that he would have police ticket her car when she parked in violation of a two-hour parking limit that had not previously been enforced against her or others. Within hours of the threat, Garcia received her first traffic ticket, which was followed by three more over the next two months. Reinstating a jury verdict for Garcia, the Eighth Circuit distinguished *Naucke v. City of Park Hills*, 284 F.3d 923 (8th Cir. 2002), a § 1983 case where "plaintiff charged that the defendants had made harassing, derogatory, and

humiliating comments about her," and noted that "in contrast to *Naucke*, [here] defendant's conduct went beyond mere speech, however offensive. Defendant, in his capacity as Mayor, engaged the punitive machinery of the government in order to punish . . . Garcia for speaking out." 348 F.3d at 729.

Given *Suarez*'s command that we focus "on the status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts," 202 F.3d at 686, in determining the effect on a plaintiff's First Amendment rights and the similar, but objective, test applied in *Baltimore Sun*, we begin by viewing Blankenship as a citizen who has "entered the political debate," *Eaton*, 379 F.3d at 956. The crux of Blankenship's claim is that Manchin threatened retaliation against Blankenship's company, which operates in a highly regulated industry. Thus, the person of ordinary firmness we consider should be one who is president of a company in a highly regulated industry. *Cf. Baltimore Sun*, 437 F.3d at 419 (considering "reporters of ordinary firmness" in the inquiry). In sum, our inquiry is whether Manchin's alleged conduct would chill the free speech rights of an ordinarily firm owner of a regulated business who has entered the political arena.

The typical reporter, as recounted in *Baltimore Sun*, is accustomed to politicians' refusing to comment and having to curry favor for access, so that the Governor's ban on commenting to certain reporters in that case did not sufficiently impair the status quo as to chill speech. *See* 437 F.3d at 419. Unlike a reporter, the typical citizen involved in politics does not contend with the retaliatory conduct of state officials as a "cost" of entering the political arena. While a citizen who voluntarily enters public debate may suffer some hardships—the public figure standard for libel, for example, may apply to statements made about them—threats of adverse regulatory action are not properly among these hardships. *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347-50 (discussing the differing liability standards for libel of public versus private figures); *Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999) (same); *Wilson v. Daily Gazette Co.*, 588 S.E.2d 197 (W. Va. 2003) (same).

*Eaton* is also inapposite to the case at bar. While Blankenship is fully able to respond to Manchin's criticisms through the media—for

example, countering the accusations about Massey's safety record—he cannot utilize the marketplace of ideas to shield himself against adverse regulatory action. *Cf. McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 125 S. Ct. 2722, 2747 (2005) (O'Connor, J., concurring) ("In the marketplace of ideas, the government has vast resources and special status."); *Finzer v. Barry*, 798 F.2d 1450, 1493 (D.C. Cir. 1986) (Wald, J., dissenting) ("The driving concept of the first amendment to promote a marketplace of ideas is twisted out of shape when, through governmental action, only one side of the debate is permitted access to the premium selling booth."), *aff'd in part*, *rev'd in part sub nom. Boos v. Barry*, 485 U.S. 312 (1988). Blankenship "remained free" to accuse the Governor of targeting his company, but that would do little to minimize the damage from any actual adverse action taken against Massey. Unlike in *Eaton*, where the background check conducted by the sheriff had no potential of prospective harm, the threat of continued and heightened regulatory scrutiny of Massey loomed large, serving its function as a constant "warning" to Blankenship about speaking out on political issues.

Similarly, this case is unlike *Mattox*, where there was an attempt to discredit a public official based on his views. While Manchin was trying to discredit Blankenship, his attempts crossed the line into threats against Massey. As the Eighth Circuit noted in *Garcia*, there is a clear difference between speech that is a "deliberate attempt to discredit" and speech that threatens to "engage[ ] the punitive machinery of the government in order to punish" someone for speaking out. 348 F.3d at 729.

Blankenship's actions, although not dispositive, are relevant to the ordinary firmness inquiry. *Constantine*, 411 F.3d at 500. Appellant argues that Blankenship has continued actively to participate in West Virginia politics. Though Blankenship continues to be politically active, he claims that his speech has been chilled and until contrary evidence is presented, that claim must be accepted. A chilling effect need not result in a total freeze of the targeted party's speech. *See id.* ("The cause of action targets conduct that tends to chill such activity, not just conduct that freezes it completely.") Unlike in *Baltimore Sun*, Blankenship did not deny that he has been chilled or evade the question at oral argument; rather, he continues to allege that his speech rights have been chilled. *Cf.* 437 F.3d at 420 n.1. The fact that

Blankenship continues to speak is informative to our ordinary firmness inquiry, but, at this stage, not dispositive. Appellant may demonstrate that Blankenship has, as a matter of law, not been chilled in any respect; that opportunity, however, must be undertaken with the aid of discovery and not at the motion-to-dismiss stage.

III.

Having found that the facts as set forth in Blankenship's complaint, when viewed in the light most favorable to him, establish the violation of a constitutional right, we must address whether this right was clearly established. *See Saucier*, 533 U.S. at 201. We undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." In *Saucier*, the Supreme Court made clear that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02. In this case, in determining "[w]hether a right has been specifically adjudicated or is manifestly apparent from broader applications of the constitutional premise in question," we may consider decisions of the Supreme Court, this Court, and the Supreme Court of Appeals of West Virginia. *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004).

This Court has held that "[i]t is well established that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right." *Trulock*, 275 F.3d at 405 (citing *Suarez*, 202 F.3d at 685). In the specific context at issue here, it is clearly established that "the First Amendment prohibits an officer from retaliating against an individual for speaking critically of the government." *Id.* at 406.

Appellant acknowledges that in *Suarez,* this Court held that a public official's retaliatory action in the nature of speech that threatens, coerces, or intimidates, intimating that punishment, sanction, or adverse regulatory action will imminently follow, establishes a violation of an individual's First Amendment rights. 202 F.3d at 687. Appellant, however, argues that *Suarez* did not put forth a bright line test because it was based on a balancing of the First Amendment rights of citizens and public officials. Although *Suarez* did concern

itself with striking a balance of rights between citizens and public officials, the result of that balance was "[t]he requirement that [a] public official's speech include a threat, coercion, or intimidation." *Id.* at 688 n.13. This requirement represents a bright line, one that the Governor's remarks clearly violated.

In sum, the general proposition that a government official may not retaliate against a citizen for the exercise of a constitutional right is clearly established law, per *Trulock*. The specific right at issue here, the right to be free of threats of imminent, adverse regulatory action due to the exercise of the right to free speech, was clearly established by this Court in *Suarez*.

## IV.

As Blankenship's complaint alleges a constitutional violation of a clearly established right, qualified immunity does not attach to the Governor's actions. Appellant's motion to dismiss was properly denied, and the ruling of the district court is affirmed.

*AFFIRMED*

WILKINS, Chief Judge, concurring in the judgment:

I agree that the district court correctly denied the motion to dismiss here. Because my reasoning differs slightly from that of the majority, however, I write separately.

As the majority correctly notes, in reviewing the denial of a motion to dismiss, we may reverse "only if it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 317 (2006) (internal quotation marks omitted).

For the reasons the majority outlines, I agree that it was clearly established at the time of the Governor's remarks that a threat of increased government scrutiny, made in retaliation for Blankenship's political speech, violated Blankenship's First Amendment rights. That leaves the questions of whether Blankenship's complaint demon-

strates that Blankenship can prove no set of facts supporting (1) his claim that the Governor made such a threat, and (2) the proposition that a reasonable person in the Governor's position would have understood at the time of his remarks that they constituted such a threat, *see Saucier v. Katz*, 533 U.S. 194, 202 (2001) (explaining that government official is entitled to qualified immunity unless, at the time of the alleged violation, "a reasonable official would understand that what he is doing violates" the right in question).

Blankenship's complaint alleges that in response to questions about the pension bond amendment, "the Governor threatened Plaintiff by warning that the government would scrutinize the affairs of Plaintiff and Massey even more closely in light of Plaintiff's decision to participate in the public debate over the pension bond amendment"; that "[t]he Governor went on to say, 'I think that is justified now, since [Blankenship] has jumped in there with his personal wealth trying to direct public policy'"; and that the Governor claimed that Massey was guilty of "'many violations'" of state environmental regulations. J.A. 9 (emphasis added).

The Governor argues that the *Gazette* article provides the proper context for the statements and demonstrates that they were predictions of scrutiny by the media and the public rather than threats of additional governmental scrutiny. That argument fails to recognize, however, that we must accept as true the allegation in the complaint that the Governor warned Blankenship that the government would scrutinize him more closely in light of his decision to speak publicly regarding the pension bond amendment. The fact remains that even if the words quoted in the *Gazette* article do not comprise such a threat themselves, Blankenship may eventually prove such a threat by words that were not quoted in the article but that any reasonable official in the Governor's position would have understood to have been a threat.

The Governor disagrees, observing that Blankenship's complaint plainly states that "the Governor's threats against Plaintiff were reported in the Charleston Gazette." *Id.* But the Governor's reliance on this language is misplaced. The Governor reads the complaint as if it alleged that the Governor's threats against Blankenship were *quoted* in the *Gazette*. But, the identified language in the complaint

may simply refer to the portion of the *Gazette* article that paraphrased the Governor's words. *See id.* at 46 ("The governor said Blankenship, who has launched a personal campaign against the bond plan, should expect tougher scrutiny of his business affairs."). In fact, not only does the complaint not plainly state that it is based *only* on words quoted in the *Gazette* article, but it actually suggests that it is not so limited. *See id.* at 9 (alleging that Governor threatened further government scrutiny and then "went on to say" some of the words quoted in the *Gazette*).

For this reason, the Governor thus has not demonstrated that Blankenship cannot prove any set of facts that would entitle him to relief, and I therefore concur in the judgment affirming the denial of the motion to dismiss.