**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-1957

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS; SOUTH CAROLINA AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL ORGANIZATIONS,

Plaintiffs - Appellants,

v.

NIMRATA HALEY, a/k/a Nikki Haley, in her official capacity
as Governor of South Carolina; CATHERINE TEMPLETON, in her
official capacity as Director of the South Carolina
Department of Labor, Licensing and Regulation,

Defendants - Appellees.

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  C. Weston Houck, Senior District
Judge.  (2:11-cv-00153-CWH)

Argued:  March 20, 2012                    Decided:  May 3, 2012

Before NIEMEYER, DUNCAN, and DAVIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Kathleen  Phair  Barnard,  SCHWERIN  CAMPBELL  BARNARD
IGLITZIN & LAVITT, Seattle, Washington, for Appellants.  Ashley
Prickett Cuttino, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC,
Greenville,  South  Carolina,  for  Appellees.    **ON   BRIEF:**
Christopher Corson, General Counsel, INTERNATIONAL ASSOCIATION
OF MACHINISTS & AEROSPACE WORKERS, Upper Marlboro, Maryland;
Armand Derfner, DERFNER ALTMAN & WILBORN, Charleston, South

Carolina, for Appellants.  Robert D. Cook, James E. Smith, Jr., OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina; Mark H. Wall, WALL TEMPLETON & HALDRUP, PA, Charleston, South Carolina, for Appellees.

───────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The International Association of Machinists and Aerospace Workers ("IAMAW") and the South Carolina AFL-CIO ("SC AFL-CIO") (collectively, "the unions") brought claims pursuant to 42 U.S.C. § 1983 against Nimrata Haley, Governor of South Carolina, and Catherine Templeton, Director of the South Carolina Department of Labor, Licensing, and Regulation ("SC DOL"),[1] in their official capacities (collectively, "Appellees") for making anti-union statements. The unions allege that Appellees instituted a policy of enhanced regulatory scrutiny against unions and pro-union workers in retaliation for their attempts to organize workers in the state in violation of their rights under the First and Fourteenth Amendments and the National Labor Relations Act ("NLRA"), codified as amended at 29 U.S.C. §§ 151-169. The unions sought, inter alia, an injunction requiring Appellees to "commit . . . to remain neutral." J.A. 53. The district court dismissed the complaint and the unions appealed. Based largely on the reasoning of the district court, we affirm.

---

[1] Templeton has since left SC DOL.

I.

A.

Because this appeal arises from a motion to dismiss, we look primarily to the unions' complaint[2] for the relevant facts. See Brockington v. Boykins, 637 F.3d 503, 505-06 (4th Cir. 2011). We do not, however, take account of allegations in the complaint labeled as fact but that constitute nothing more than "legal conclusions" or "naked assertions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

The primary allegations in the unions' complaint are (1) that Haley and Templeton were

> unlawfully utilizing "increased regulatory scrutiny" of union activities and threats to immediately activate the "punitive machinery" of state government against unions and against employees who wish to join or who advocate in favor of unions . . . in retaliation for the activities of [the unions], [the unions'] members and their potential members, in violation of their 1st Amendment rights,

J.A. 36-37 (quoting Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006)); and (2) that Appellees "agreed to utilize the machinery of state government to prevent workers in the state from joining unions, from organizing unions in their workplaces and from advocating for unions," in direct conflict with the

---

[2] Unless otherwise noted, "complaint" refers to the unions' second amended complaint.

4

NLRA, J.A. 41. The activities against which Appellees allegedly retaliated are (1) IAMAW's previous representation of aerospace workers in South Carolina, including at a manufacturing plant acquired by Boeing Co. in 2009; (2) IAMAW's ultimately unsuccessful fight against decertification at the Boeing plant in 2009; (3) IAMAW's continuing advocacy for "working conditions and organizing [of] workers at . . . facilities in South Carolina, including those operated by Boeing," J.A. 39; and (4) SC AFL-CIO's participation "in the campaign to retain IAMAW as the representative of workers at Boeing's facility," id.

According to the complaint, the regulatory machinery through which Appellees retaliated and will continue to retaliate against the unions and their allies is South Carolina's "Right to Work" law. South Carolina's Right to Work law makes unlawful agreements between unions and employers to restrict employment to union members and outlaws conditioning employment on union membership. S.C. Code §§ 41-7-20, 30. The law also makes it unlawful for "any person . . . to interfere . . . with [any] person in the exercise of his right to work . . . or . . . to compel or attempt to compel any person to join, or support, or refrain from joining or supporting any labor organization." Id. at § 41-7-70(1). Investigation and enforcement related to South Carolina's Right to Work law are the responsibilities of the Director of SC DOL. Id. at § 41-7-

5

75(A). The unions allege that Appellees have used and will continue to use the investigative and enforcement power provided by this law in order to unfairly subject the unions and their allies to increased regulatory scrutiny.

Notably for purposes of our analysis, the unions alleged no specific regulatory action taken against them or their allies pursuant to the Right to Work law or any other law. They pointed instead to statements made by Appellees that contain anti-union rhetoric.[3] For example, the unions alleged that Haley, at a press conference announcing her intention to nominate Templeton to be Director of SC DOL, stated:

> The [SC DOL] is going to have a large role over the next couple of years, one being with the unions, and that is the fact that we think we are going to have a big union fight, as we go forward, with Boeing, and you are right now looking at the only female in the nation [Templeton] that has fought the largest UAW push that we've been through, and so she is ready for that, she is ready for the challenge, she knows what it takes to take it on, and she understands that it's going to be a partnership level that we cannot lose.

J.A. 40-41. At the same press conference, Haley said, "We are going to fight the unions, and I needed a partner to help me do it; [Templeton is] the right person to help me do it." Id. at 41. Later, Haley publicly stated that it was "no secret" that she does not "like the unions," id. at 43, and "[w]e keep the

---

[3] We assume, without deciding, that all statements made by Appellees were made under color of state law.

6

unions out. . . . We are not going to allow unions to come into this state," id. at 44. Templeton, for her part, is alleged to have stated, for example, that "this is an anti-union administration. . . . We don't want Boeing or anybody else to introduce extra bureaucracy into the administration." Id. at 43.

The unions asserted four constitutional violations. First, the unions claimed that Appellees' statements show that a policy of increased regulatory scrutiny has been instituted in retaliation for the unions' protected activity, in violation of the First Amendment, and that this policy "will violate the rights of employees at Boeing plants, and elsewhere in South Carolina, to organize, join a union, bargain collectively, and engage in other protected concerted activity" (the "retaliation" claim). Id. at 46. Second, the unions alleged that Appellees' actions have violated the First Amendment by "chill[ing] the speech and associational activities of members and potential members and allies of [the unions] and other labor unions everywhere within the state of South Carolina" (the "chilling" claim). Id. at 46. Third, the unions claim that the activities of Appellees have "deprive[d] South Carolina workers of their liberty to join and/or support unions" without due process of

law, in violation of the Fourteenth Amendment.[4]  Id. at 51. Fourth, the unions allege that Appellees' activity amounts to "disparate and adverse treatment" that deprives the unions and their allies of "equal protection under the Fourteenth Amendment."  Id.

The unions brought one non-constitutional claim.  The unions alleged that the Appellees' activities are preempted by the NLRA.  Section 7 of the NLRA guarantees workers the right to form unions and bargain collectively.  It provides, "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  The section preempts state regulation of this protected conduct.  Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n, 427 U.S. 132, 148-51 (1976); San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 244 (1959).  The unions claimed that Section 7 preempts the actions by appellees:

---

[4] The unions do not specify whether they assert a violation of procedural or substantive due process.  Based on the allegations in the complaint, as well as the unions' briefing, however, we are comfortable interpreting the unions' claim as involving substantive due process.

By publicly declaring the State of South Carolina's policy and plan to oppose workers' efforts to organize unions and to advocate for better terms and conditions of work in association with other workers, and by Haley's appointing Templeton as the LLR Director to help her "fight the unions," Defendants Haley and Templeton are acting under color of state law to interfere with rights of unions, union members and potential union members guaranteed by the NLRA. This declared policy to "fight unions" is preempted by the NLRA.

J.A. 48. The unions sought an injunction barring this "policy and plan."

B.

On January 20, 2011--approximately one week after Haley's swearing in as governor--the unions filed their original complaint. The unions filed an amended complaint on February 18, 2011, adding additional statements by Appellees. On March 3, 2011, Appellees moved to dismiss the unions' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Before the ruling on Appellees' motion, the district court allowed the unions to file a second amended complaint. The unions filed their second amended complaint on July 25, 2011. On August 8, 2011, the district court granted Appellees' motion.

In dismissing the unions' complaint, the district court found three determinations dispositive. First, the district court determined that in making the anti-union statements, Appellees were themselves engaging in protected activity. In other words, "First Amendment rights are implicated on both

9

sides of this case." J.A. 70. As such, the district court imposed a heightened burden on the unions, viewing skeptically any proposed interference with Appellees' protected activity. Second, the district court determined that the statements allegedly made by the Appellees contained no specific threats of regulatory action, but instead were the type of "general, broad, political pronouncements," that are "both pervasive and mundane" in the political arena. Id. at 75-76. If such commonplace activity were actionable, the district court concluded, virtually every public statement by an elected official on a divisive political issue would spawn litigation. Third, the district court determined that the unions alleged no specific regulatory action against them or their allies. "Although a threat need not be corroborated by action to be actionable," the district court reasoned, such action and the sequence in which it occurred could support a plaintiff's interpretation of an otherwise innocuous statement as a threat. Id. at 76-77. The district court concluded that these infirmities doomed the unions' claims. The unions timely appealed.

## II.

On appeal, we review a district court's 12(b)(6) dismissal de novo, employing the same standard as the district court. To survive a motion to dismiss, a complaint must contain

10

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). To satisfy this plausibility standard, the complaint must indicate that a defendant's liability is "more than a sheer possibility." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (quoting Twombly, 550 U.S. at 557). Following Twombly, if there is an "obvious alternative explanation" for each of the actions alleged that suggests lawful conduct, the complaint has not satisfied the plausibility standard. See 550 U.S. at 567. We now turn to a consideration of the arguments.

A.

We begin our analysis with the unions' retaliation claim. "A retaliation claim under 42 U.S.C. § 1983 must establish that the government responded to the plaintiff's constitutionally protected activity with conduct or speech that would chill or adversely affect his protected activity." The Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 416 (4th Cir. 2006). The three elements of a retaliation claim are: (1) protected activity by the plaintiff, (2) an adverse action against plaintiff that chills the plaintiff's protected activity, and (3) a causal relationship between the protected activity and the adverse

11

action.  Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000).

Like the district court, we focus our analysis on the second element: an adverse action against a plaintiff that chills the plaintiff's protected activity.  First, we agree with the district court that the unions have failed to sufficiently allege any regulatory action taken against them or their allies. Although the unions do assert, for example, that "Haley . . . has established, maintained, and enforced the State's policy and practice to suppress . . . workers' efforts to join a union," J.A. 39, they point to no investigation, fine, or any other action, regulatory or otherwise, to support this or any other similar allegation.  Without any factual underpinning, such allegations amount to nothing more than "naked assertions" that we cannot credit for the purpose of analyzing a motion to dismiss.  See Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).[5]

Yet this is not the end of our inquiry.  A plaintiff may sufficiently allege the second element of a retaliation claim based upon speech alone.  As the district court correctly observed, however, a plaintiff relying only on speech to fulfill

_____

[5] To be sure, should any adverse action occur later, the unions may renew their challenge, although questions of causation remain.

12

the second element has a heavy burden to overcome. As we noted in Page v. Lexington County School District One, 531 F.3d 275 (4th Cir. 2008), "[t]he needs of effective governance command that the bar limiting government speech be high." Id. at 287 (quoting Kidwell v. City of Union, 462 F.3d 620, 626 (6th Cir. 2006)). For this reason,

> [w]hen the challenged government action is government speech, there is no retaliation liability--even if the plaintiff can demonstrate a substantial adverse impact--unless the government speech concerns "private information about an individual" or unless it was "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow."

Baltimore Sun, 437 F.3d at 417 (quoting Suarez, 202 F.3d at 689). There is no allegation that Appellees' statements concerned private information about an individual, so, to be actionable, the statements alleged by the unions must threaten imminent action.

We agree with the district court that Appellees' alleged statements do not contain such threats. On their face, the statements alleged by the unions contain nothing that we could plausibly interpret as indicating imminence. Most of the statements do not reference action at all--e.g., Haley's statement that she does not like unions. Even the statements that include an indication of action, however--for example, Haley's statement that Appellees are "going to fight the

13

unions"--are far too broad and nebulous to allow us to interpret them as intimating imminent action.[6] Supporting this conclusion is the fact that the unions filed their second amended complaint nearly eight months after their original complaint--in which they first claimed that such statements intimated imminent action--and yet the second amended complaint contains no allegation of specific regulatory action following these statements. Although, as the district court correctly noted, actual regulatory action is not necessary to state a claim for retaliation, such action is helpful to a plaintiff's argument that an otherwise innocuous statement should be interpreted as a threat of imminent action. See Blankenship, 471 F.3d at 529 ("[T]he actual regulatory scrutiny that [plaintiff] experienced shortly after [Governor Manchin's remarks] strongly supports interpreting Manchin's remarks as a threat of increased regulatory scrutiny."). In the absence of any such support, we

---

[6] In the same vein, such general statements are not actionable because there is an "obvious alternative explanation" as to the meaning of each of the statements alleged that suggests lawful conduct. See Twombly, 550 U.S. at 567. The obvious alternative explanation is that these statements are nothing more than rhetoric in a political debate that is by its nature "rough and tumble." Baltimore Sun, 437 F.3d at 419 (quoting Eaton v. Meneley, 379 F.3d 949, 956 (10th Cir. 2004)). Because the unions have alleged no facts tending to show that these statements are anything but heated political rhetoric, the statements are not actionable.

14

are left with the conclusion that Appellees' statements are not threats of imminent action and therefore are not actionable.

B.

We now turn briefly to the unions' remaining claims, each of which fails for the same reason that their retaliation claim failed: the unions have failed to allege any action or threat of imminent action on the part of Appellees. We first consider the unions' chilling claim. To be actionable as chilling protected activity, the alleged government action must be "likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (quotation marks omitted). We agree with the district court that Appellees' statements--indicating nothing more than political opposition to unions and not threatening any action--"would not reasonably deter workers or union organizers of ordinary firmness from exercising their First Amendment rights." J.A. 78. Accordingly, we affirm the dismissal of the unions' chilling claim.

We next consider the unions' two Fourteenth Amendment claims, beginning with the substantive due process claim. As we have stated:

> The core of the concept of substantive due process is the protection of the individual against arbitrary action of government . . . . [O]nly the most

15

> egregious official conduct can be said to be arbitrary in the constitutional sense. Thus, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. The kind of . . . conduct that fairly can be said to shock the conscience involves abusing executive power, or employing it as an instrument of oppression.

Martin v. Saint Mary's Dep't Soc. Servs., 346 F.3d 502, 511 (4th Cir. 2003) (quotation marks, citations, and alterations omitted). Without some accompanying regulatory action, the political rhetoric alleged by the unions here is itself protected activity and thus a far cry from an abuse of power or an act of government oppression. Accordingly, the district court was correct to dismiss this claim. As to equal protection, without an allegation of some action directed at the unions or their allies, their allegation of disparate treatment must be rejected. Accordingly, the district court was correct to reject this claim.

Finally, we consider the unions' NLRA preemption claim. This claim too must fail because the unions allege no action that could be preempted by the NLRA. Whatever the NLRA preempts, it does not act as a bar to anti-union political rhetoric without more.[7]

---

[7] To their credit, the unions acknowledge as much. See Appellants' Br. 28 ("[W]hat the NLRA demands of states is that their officials do not go beyond protected expression of political opinion.").

16

III.

For the foregoing reasons, the dismissal of the unions'
claims is

<u>AFFIRMED</u>.