# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-3255

_____

PHL Variable Insurance Company

*Plaintiff - Appellee*

v.

2008 Christa Joseph Irrevocable Trust, by and through its trustee, BNC National Bank

*Defendant*

Midas Life Settlements LLC

*Intervenor Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 8, 2014
Filed: April 9, 2015

_____

Before LOKEN, COLLOTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

PHL Variable Insurance Company brought this action to rescind a $10 million life-insurance policy after it discovered the policy application grossly misrepresented the insured's finances. Following a bench trial, the district court[1] granted rescission. Midas Life Settlements LLC now appeals. We affirm.

I.

Although this was not a simple case below—proceedings before the district court spanned three years, required over two-hundred-fifty docket entries, and included a six-day bench trial—the district court developed the record well. We begin with the relevant facts, as found by the district court, which are not contested here. The insured was a retired seamstress named Christa Joseph. Joseph was of modest means. Her annual household income never exceeded $40,000 and her most valuable property was a condominium worth $169,990, which had gone into foreclosure. Joseph was born in Haiti. Although she had lived in the United States for some years, she did not speak English well.

A man named Johann John Jean indirectly referred Joseph to the insurance agency Diverse Financial. Joseph did not know Jean, and they had never met. Jean referred retirees to Diverse for a fee. In April 2008, Diverse submitted an application for a $10 million life-insurance policy on Joseph's life to PHL. The application falsely stated Joseph's net worth was $11,906,000 and her other income was $497,000. The application listed the 2008 Christa Joseph Irrevocable Trust as the proposed beneficiary. In early June 2008, Joseph signed an agreement establishing the 2008 Christa Joseph Irrevocable Trust (the "Trust"). The Trust's intended purpose was to own life insurance policies purchased on Joseph's life and to comply with the terms of a related financing agreement. Joseph designated her daughter,

---

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

Helen Ramsay, as the beneficiary. She appointed BNC National Bank as the trustee and Jean as the trust protector. Jean served as trust protector at the behest of Doron Amir, who was a principal or agent of Diverse. After Joseph established the Trust, Jean, as trust protector, directed BNC to apply for and purchase a $10 million life-insurance policy from PHL. In June 2008, PHL received an application for insurance that was essentially a copy of the April application. The June application also falsely stated Joseph's net worth was $11,906,000 and her other income was $497,000. Joseph and BNC both signed the June application.

The false financial information was inserted into the application as part of a larger scheme to defraud PHL. Diverse—and in particular one of its principals, Roy Dekel—was "ground zero" for this fraud:

> Dekel . . . arranged to have Joseph sign a blank application, after which he caused flagrantly false information about Joseph's net worth and income to be inserted into the application. . . . Dekel likely worked in conjunction with Amir, who also played some role in procuring the Policy and who asked Jean to serve as the trust protector. . . . Dekel and Amir acted with fraudulent intent for the purpose of inducing PHL to issue a high-value life-insurance policy that would generate a large commission for Diverse.

PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Trust, 970 F. Supp. 2d 932, 938 (D. Minn. 2013). Further, "[i]n his capacity as trust protector, Jean knowingly participated in this fraudulent scheme and knew that Diverse submitted willfully false and intentionally misleading financial information to PHL in order to obtain a high-value life-insurance policy on the life of Joseph." Id. However, "Joseph did not personally know of the misrepresentations on the insurance applications. . . . It is likely that she signed at least some documents—including the Policy application—in blank." Id. at 937. It is also unlikely Joseph "understood much more than that a policy in some amount had been taken out on her life." Id.

PHL issued a $10 million life-insurance policy on Joseph's life in July 2008 (the "Policy"). The Trust was named as beneficiary. Although "PHL's financial underwriting of the [Policy] left a lot to be desired," PHL "did not deliberately turn a blind eye" to the application's problems. Id. at 940. "Moreover, any underwriter at the time would have had trouble grasping the magnitude and audacity of the fraud that was being perpetrated against PHL."[2] Id. The Trust financed the Policy premiums through a loan from PFG Private Financing, LLC. After PFG Private originated the loan, it assigned its interest to PFG Loans Funding, LLC. Repayment on the loan was due July 23, 2010. In May 2010, Jean signed a letter directing BNC to surrender the Policy to PFG Loans in full satisfaction of the Trust's financial obligations. Joseph and BNC also signed this letter. In August 2010, BNC entered an agreement to transfer the Policy from the Trust to PFG Loans. PFG Loans later sold the Policy to Estate Planning LLC, which then sold the Policy to Midas.[3]

PHL brought this action against the Trust in July 2010, within the Policy's two-year contestability period, seeking to rescind the Policy for fraud in the Policy

---

[2]The fraud went well beyond falsifying Joseph's financial information on the Policy application. For example, most likely either Dekel or Amir fraudulently procured authorization for Dekel's wife, Shayna Goldburg, to become an authorized PHL agent. Either Dekel or Amir also forged Goldburg's signature on the April and June applications, falsely listing her as the licensed producer. And either Dekel or Amir forged other documents purportedly submitted by Goldburg to PHL in support of the Policy application. This is not to mention PHL received "false tax returns [for Joseph] supposedly prepared by a CPA who was a real CPA but who, it turned out, had never even heard of Joseph." PHL Variable Ins. Co., 970 F. Supp. 2d at 940.

[3]While PHL disputed the validity of these transfers in the district court, it does not raise their validity as an issue on appeal. We therefore assume the transfers were valid.

application.[4]  The Trust did not appear in the action, and Estate Planning intervened as a defendant.  The district court later substituted Midas as intervenor-defendant after it acquired the Policy.  After Joseph died from cancer in September 2011, Midas filed a counterclaim for the Policy proceeds.  Following a bench trial, the district court granted rescission and held that PHL could keep the Policy premium.  Midas now raises two arguments on appeal: (1) that PHL cannot rescind the Policy because its own agent completed the Policy application and Joseph was unaware of the misrepresentations; and (2) that PHL is estopped from rescinding the Policy because it had reason to know of the misrepresentations.

II.

Following a bench trial, we review the district court's legal conclusions de novo and its factual findings for clear error.  Urban Hotel Dev. Co. v. President Dev. Grp., L.C., 535 F.3d 874, 879 (8th Cir. 2008).  "As a diversity case, we must apply Minnesota law."  Integrity Floorcovering, Inc. v. Broan-Nutone, LLC, 521 F.3d 914, 917 (8th Cir. 2008).  "If the Minnesota Supreme Court has not spoken on a particular issue, we must attempt to predict how the Minnesota Supreme Court would decide an issue and 'may consider relevant state precedent, analogous decisions, considered

---

[4]PHL also claimed the Policy was void for lack of an insurable interest and later argued Midas did not own the Policy and thus lacked standing.  We note we recently decided another case where PHL claimed a policy was void for lack of an insurable interest.  See PHL Variable Ins. Co. v. Bank of Utah, No. 14-1210, 2015 WL 1086246, at *4 (8th Cir. March 13, 2015) (predicting that Minnesota Supreme Court would find that, under Minnesota common law, "a policy purchased by an insured on his own life would [not] be void *ab initio* at the instance of the insurer") (internal quotation marks omitted).  Here, the district court declined to determine whether the Policy was void for lack of an insurable interest and found Midas possessed standing.  These issues have not been raised on appeal, and we need not address them.

dicta . . . and any other reliable data.'" Id. (alteration in original) (quoting Kovarik v. Am. Family Ins. Grp., 108 F.3d 962, 964 (8th Cir. 1997)).

We first address Midas's argument that PHL cannot rescind the Policy because Joseph was unaware of the misrepresentations PHL's own agent made in the Policy application. The parties agree that Minnesota common law controls our resolution of this issue because, as the district court put it, this case "fall[s] between statutory cracks." PHL Variable Ins. Co., 970 F. Supp. 2d at 941; see Minn. Stat. § 60A.08, subd. 9 (excepting life insurance from section addressing insurance applicant's misrepresentations); Minn. Stat. § 61A.11 (covering life-insurance policy misstatements relating only to "age, physical condition, and family history"). Under Minnesota common law, insurers generally may rescind a policy if they discover material misrepresentations in the policy application. See Perine v. Grand Lodge A.O.U.W., 53 N.W. 367, 368 (Minn. 1892) ("In so far as the answers given [in an insurance application] were material, . . . they must have been substantially true, in substantial accordance with the facts stated, or the policy would have been avoided, even though any misstatement . . . was made honestly, and not fraudulently."); see also Schmitt v. U.S. Fid. & Guar. Co., 210 N.W. 846, 849 (Minn. 1926) ("We have held that, if a misrepresentation is material, no intent to deceive need be shown.").[5]

Midas does not appeal the district court's determination that the financial misrepresentations in the Policy application were material. But it contends PHL cannot avail itself of the general rule permitting rescission because PHL's own agent, Diverse, was responsible for the misrepresentations. Even assuming Diverse was PHL's agent, a point PHL contests, we disagree.

---

[5]Midas has drawn our attention to Larson v. Northwestern Mutual Life Insurance Co., 855 N.W.2d 293 (Minn. 2014), where the Minnesota Supreme Court recently held "that evidence of the insured's subjective intent is required when an insurer seeks to rescind a policy under Minn. Stat. § 61A.11." Id. at 299. Larson is inapposite because Minn. Stat. § 61A.11 does not control here.

Midas relies on Pomerenke v. Farmers Life Insurance Co., 36 N.W.2d 703 (Minn. 1949), where the Minnesota Supreme Court explained that in certain circumstances insurers are prohibited from rescinding policies on the basis of material misrepresentations:

> Where an application for insurance is made out by an insurance agent in the course of his agency and the insured truthfully gives the agent the correct answers, but the agent records the answers in the application incorrectly without the fault, knowledge, or collusion of the insured, and the insured signs the application without first having read it—although he had the opportunity to do so—in reliance upon the good faith of the agent, the insurance company is not relieved from liability on the policy, and the act of the agent in recording incorrect answers is deemed the act of the insurer and not that of the insured.

Id. at 706. This proposition is well-established in Minnesota law, and in fact pre-dates Pomerenke. See, e.g., Kansel v. Minn. Farmers' Mut. Fire Ins. Ass'n, 16 N.W. 430, 430 (Minn. 1883). For convenience, we refer to it as the "Pomerenke rule."

After careful review, we predict the Minnesota Supreme Court would not apply the Pomerenke rule to this case. The Pomerenke rule requires the insured to provide truthful answers to the agent. See Zimmerman v. Bankers' Cas. Co., 165 N.W. 271, 272 (Minn. 1917) (stressing that Pomerenke rule applies "[i]f, at the time of giving the application in question, the [insured] made to the agent a full, fair, and truthful statements of facts"). That is not what happened here. Rather, Dekel arranged for Joseph to sign a blank policy application, falsified Joseph's financial information, and did so as part of a larger scheme to defraud PHL. Midas does not argue any facts on appeal that would support a claim that Joseph provided truthful answers. And after independently reviewing the record, we find none. Cf. Dahlke v. Metro. Life Ins. Co., 15 N.W.2d 524, 525 (Minn. 1944) (placing burden on defendant to prove defense); Gude v. Exch. Fire Ins. Co. of N.Y., 54 N.W. 1117, 1117 (Minn. 1893) (holding that

plaintiff-insureds seeking to benefit from <u>Pomerenke</u> rule bore burden of proving agency).

The purpose of the <u>Pomerenke</u> rule is to protect an insured who "relie[s] in good faith on the agent's completing the application correctly." <u>Ser Yang v. W.-S. Life Assurance Co.</u>, 713 F.3d 429, 433 (8th Cir. 2013). It would not serve that purpose to apply the <u>Pomerenke</u> rule here because an insured who signs a blank application without providing the agent truthful answers cannot trust in the agent's faithful transcription. <u>See</u> <u>Smith v. Benefit Ass'n of Ry. Emps.</u>, 244 N.W. 817, 818 (Minn. 1932) (stating that the <u>Pomerenke</u> rule applies where the insured "is without knowledge that the answers are incorrectly written *and is not at fault in not knowing*") (emphasis added).

Midas cites no cases, and we find none, where the Minnesota Supreme Court applied the <u>Pomerenke</u> rule where the insured signed a blank policy application without providing truthful answers. To the contrary, in the one case we did find addressing an application "signed in blank," the Minnesota Supreme Court emphasized that the <u>Pomerenke</u> rule applied only because the jury could have found "when the applications were taken, [the insured] stated facts to [the agent] which he failed to mention in the answers he filled in, although [the insured] had requested him to do so." <u>Schmitt</u>, 210 N.W. at 848.

Midas nevertheless insists two cases, <u>Hafner v. Prudential Insurance Co. of America</u>, 247 N.W. 576 (Minn. 1933), and <u>Ser Yang</u>, show that the <u>Pomerenke</u> rule applies even where the insured fails to provide any truthful answers. We disagree. <u>Hafner</u> is inapposite because it was decided under a statute permitting rescission only where the insured made "wilfully false or intentionally misleading" statements. 247 N.W. at 578 (internal quotation marks omitted). And the citation to <u>Ser Yang</u> is unpersuasive. In that case we held the <u>Pomerenke</u> rule could apply where testimony suggested the agent failed to ask the insured one question about her medical history.

-8-

See Ser Yang, 713 F.3d at 432-33. Yet because the insured provided answers to all the other questions the agent asked, we held "a reasonable jury could find that [the insured] relied in good faith on the agent's completing the application correctly." Id. at 433. Ser Yang thus shows an agent's failure to ask one question does not defeat the insured's good-faith reliance on the agent's accurately recording the insured's answers to the questions the agent did ask. It does not suggest insureds need provide no answers at all.

Midas further argues the Pomerenke rule should apply in this case because under Minnesota law "the risk of loss is properly placed with insurance companies for *any* errors and misrepresentations by the insurance agents." Appellant Br. 24 (emphasis added). We believe Midas overstates Minnesota law. Midas relies on Kansel, yet Kansel never made as broad a statement as Midas makes here. The question there was whether insurers could escape the Pomerenke rule by stipulating in their policies that all statements in the application would be charged to the insured. Kansel, 16 N.W. at 430-31. In holding the stipulations insufficient, the Minnesota Supreme Court noted that insurance agents "must be deemed the agents of the insurers and not of the insured in all that they do in preparing the applications." Id. at 430. But Kansel never held that insurers would bear responsibility for all their agents' misdeeds. Instead, it stated that insurers would be held responsible for misrepresentations in policy applications where the circumstances described in Pomerenke applied; those circumstances, of course, do not involve an insured signing a blank application without providing truthful answers. See Kansel, 16 N.W. at 430 ("[W]here an agent to procure and forward applications for insurance, either by his direction or direct act, makes out an application incorrectly, *notwithstanding all the facts are correctly stated to him by the applicant*, the error is chargeable to the insurer . . . .") (emphasis added); see also Shaughnessy v. N.Y. Life Ins. Co., 203 N.W. 600, 602 (Minn. 1925) (stating that Kansel required the insured to "correctly state[] the facts to the insurer's agent," and finding Kansel inapplicable in part because "[n]o evidence was introduced showing that the facts were correctly stated").

Moreover, another Minnesota Supreme Court case directly contradicts Midas's assertion that the Minnesota Supreme Court holds insurers liable for all their agents' misdeeds. In Bratley v. Brotherhood of American Yeomen, 198 N.W. 128 (Minn. 1924), the Minnesota Supreme Court held that an insurer may rescind a policy where the insurance agent and the insured *both* know of the material misrepresentations. Id. at 131-32. The Minnesota Supreme Court reasoned in Bratley it could not "hold that the insurer is bound by statements contained in an application when not only the agent, but the [insured], knows they are untrue . . . . To do so would put the [insurer] completely at the mercy of dishonest and unscrupulous agents." Id. at 132. We find the facts at hand more closely resemble Bratley than Pomerenke. We do not believe the Minnesota Supreme Court would hold PHL responsible for the misrepresentations where Joseph signed a blank application without providing truthful answers to Diverse. Cf. Cedar Rapids Nat'l Bank v. Mottle, 132 N.W. 911, 912 (Minn. 1911) ("[W]here one of two innocent parties must suffer the loss, the one whose negligence contributed to cause the loss must stand it."). As this case well makes clear, "[t]o do so would put [PHL] completely at the mercy of dishonest and unscrupulous agents." Bratley, 198 N.W. at 132.

It follows that PHL may rescind the Policy based on the application's material misrepresentations of Joseph's finances. To the extent the district court took its analysis further—concluding that Jean's knowledge of the misrepresentations could be attributed to Joseph or the Trust because Jean was an agent of either Joseph or the Trust—we find this discussion unnecessary to the resolution of the case.

III.

We next address Midas's argument that PHL is estopped from rescinding the Policy because it had reason to know of the misrepresentations in the application. Midas claims two Minnesota Court of Appeals cases, Domke v. Farmers & Mechanics Savings Bank, 363 N.W.2d 898 (Minn. Ct. App. 1985), and Alwes v.

Hartford Life & Accident Insurance Co., 372 N.W.2d 376 (Minn. Ct. App. 1985), "stand for the proposition that an insurer has a duty to reasonably investigate the facts stated in a policy application." Appellant Br. 44. Simply put, these cases do not stand for so broad a proposition. Cf. Grinnell Mut. Reinsurance Co. v. DeCamp, 1994 WL 193763, at *2 (Minn. Ct. App. May 9, 1994) (unpublished) ("In Alwes and Domke, waiver applied because the insureds indicated specific physical impairments which the insurers ignored and granted coverage, but later denied claims based on the pre-existing impairments."). Nor are they on point here, because neither involved a material misrepresentation. See Domke, 363 N.W.2d at 900 (finding that trial court did not clearly err in determining insured's statement was not a material misrepresentation); Alwes, 372 N.W.2d at 378 (noting that insured disclosed he was on disability). The district court correctly stated "Alwes has nothing to do with this case." PHL Variable Ins. Co., 970 F. Supp. 2d at 944.

We further note Midas claims, in its opening brief, that the duty to investigate arises from Domke and Alwes. Appellant Br. 44-47. There, it argues Minnesota suitability law[6] "underscore[s]" the district court's alleged misreading of Alwes. Appellant Br. 48. In its reply brief, Midas argues Minnesota suitability law provides an "independent ground[] for imposing upon insurance companies a duty to inquire." Appellant Reply Br. 24 (citing, for the first time, Minn. Stat. § 72A.20, subd. 34 (requiring insurer "either directly or through its agent" to "have reasonable grounds for believing that the recommendation is suitable for the customer")). We decline to address whether Minnesota suitability law imposes an independent duty of inquiry on insurers because Midas first raised this argument in its reply brief. See Barham v. Reliance Std. Life Ins. Co., 441 F.3d 581, 584 (8th Cir. 2006). We observe Midas

---

[6]Midas cites Minn. Stat. § 60K.46, subd. 4, which provides, in part, that "[i]n recommending the purchase of any life . . . insurance to a customer, a producer must have reasonable grounds for believing that the recommendation is suitable for the customer and must make reasonable inquiries to determine suitability."

cites no case where a court has used Minnesota suitability law to prevent an insurer from rescinding a policy.

Because Minnesota law does not impose a duty on PHL to reasonably investigate the financial information contained in the Policy application, PHL cannot be equitably estopped from rescinding the Policy.  See Alwes, 372 N.W.2d at 379 (reciting elements of equitable estoppel).

IV.

For the foregoing reasons, we affirm the district court's judgment.  We deny PHL's motion to strike portions of Midas's reply brief or, in the alternative, for leave to file a sur-reply brief.

_____