# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3473

_____

Robert R. Bennie, Jr., individually and on behalf of Bob Bennie Wealth Management, Inc.

*Plaintiff - Appellant*

v.

John Munn, in his official capacity; Jack E. Herstein, in his official capacity; Rodney R. Griess, in his official capacity

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: November 17, 2015
Filed: May 11, 2016

_____

Before RILEY, Chief Judge, BEAM and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

Robert R. Bennie, Jr., a financial advisor, sued Nebraska financial regulators after they investigated him and his broker-dealer employer around the time a newspaper reported Bennie made unkind comments about the President of the United

States. The district court[1] found that even though the regulators targeted Bennie partly in retaliation for his constitutionally protected political speech, they did not do enough to deter someone of ordinary firmness from continuing to speak, so Bennie's claim failed. Because we cannot say that finding was clearly wrong, we affirm.

## I. BACKGROUND

Until November 2010, Bennie worked for LPL Financial (LPL). LPL is a broker-dealer, meaning it holds accounts and assets and executes financial transactions. It operates through agents like Bennie, who deal with customers. As a broker-dealer, LPL is subject to regulation by the Nebraska Department of Banking and Finance (department). See generally Neb. Rev. Stat. § 8-1120; 48 Neb. Admin. Code § 1.002.01. Among other things, the department regularly reviews LPL's agents' advertisements and other public statements for compliance with applicable rules. The department can sanction broker-dealers and their agents for violations, including by fining them or barring them from operating in Nebraska. See Neb. Rev. Stat. § 8-1103(9)(a)-(b).

In late 2009, a department employee received, through an acquaintance, a promotional compact disk (CD) of Bennie's, along with an accompanying brochure, and took the CD to the department's office. The compliance supervisor at the department, Rodney Griess, reviewed the CD on the assumption Bennie was currently distributing it. In fact, Bennie had sent the CD to his clients several years earlier, when different disclosure rules were in effect, but no one in the department knew that. In the meantime, Griess determined the CD was missing disclosure required under the 2009 rules. He contacted someone at LPL, who agreed and promised to talk to Bennie. Griess forwarded LPL's admission to Jack Herstein, an assistant director of

---

[1]The Honorable John M. Gerrard, United States District Judge for the District of Nebraska.

the department, who responded "Bob [Bennie] always is seen wearing a cowboy hat lately, so I say 'Hang Him High.'"

Around the same time, Griess also reviewed a television commercial in which Bennie rode a horse and said he would give customers who did business with him "a hundred dollars towards the purchase of a firearm." Because Griess thought the offer "unusual," he suspected Bennie had not gotten the necessary approval from LPL to run the commercial. Eventually, Griess scheduled a conference call to talk to LPL about the issues with Bennie.

A few days before the call, the Lincoln Journal Star ran a story about Bennie's role in the Tea Party political movement. The article quoted Bennie denouncing the government and politicians, including President Barack Obama. The article also mentioned Bennie's business and was accompanied by a photograph of Bennie at his desk in his office. Griess emailed LPL a link to the online version of the article. In the body of his message, Griess quoted Bennie, in the article, calling President Obama "a communist," "dishonest," and "an evil man." The next day, Griess told a colleague his upcoming call with LPL would cover Bennie's "recent string of activities; i.e., lack of . . . disclosure, gun slingin ads, and calling Obama a 'communist' and an 'evil' man issues."

On the call, department employees and LPL discussed Bennie's CD and commercial and the article about him, and the department asked for information about LPL's review, if any, of the commercial and the article. Afterward, in an email exchange with LPL to schedule a follow-up call, Griess wrote that it "would be nice to know" if

> LPL anticipate[d] imposing any kind of heightened supervision, more frequent/unannounced exam schedule, specialized advertisement approval process or other sanction(s) that may provide the Department

with a little better sense that the firm is "on top of" addressing this type of activity which in turn may be of some comfort to us and really is in the best interest of the public . . . .

LPL sent Griess materials from its review and approval of the commercial and told him it had not reviewed the article. In response to Griess's question about LPL's supervision of Bennie, LPL explained that since a recent internal reorganization, Bennie's proposed advertisements were reviewed by a senior analyst. Department employees asked whether LPL had any guidelines about agents like Bennie publicly communicating their political views. LPL said it did not.

Not long after the second call, the director of the department, John Munn, asked Griess to review a mass-mailing Munn had received, in which Bennie invited prospective customers to discuss their investment plans over dinner. Griess concluded the invitation violated applicable rules, so he emailed LPL asking for the name and contact information of Bennie's senior-analyst supervisor, all notes and communications related to the review and approval of the invitation, a list of everyone in Nebraska it was sent to, and a list of everyone in Nebraska who had accepted. He also ordered LPL to cancel any scheduled dinners and not to schedule any more until the invitation was corrected. And he warned LPL that "[t]he Department may invoke whatever administrative action deemed necessary and appropriate under its authority against both Mr. Bennie and/or LPL Financial to insure compliance."

That week, Bennie contacted Nebraska Governor David Heineman and told him the department was targeting Bennie and "harassing [Bennie] because of his political views." Governor Heineman called Munn to discuss the situation. Afterward, Munn had Griess review a draft memorandum responding to the Governor. Griess observed the draft did not say anything about the newspaper article and explained he "felt compelled to at least mention it" because

-4-

While Mr. Bennie did not author the article, and does not appear to be subject to our regulatory purview regarding it, the comments made regarding the President etc., regardless of anyone's political views do tend to be quite polarizing to say the least, not all that dissimilar to the firearm purchase statement. Anyway, it's another piece of the puzzle and just saw that it was missing.

Munn agreed to "mention that situation."

Around the same time, LPL pushed back against the department's treatment of Bennie's dinner-invitation mailing, arguing both LPL and a federal regulator had approved the invitation and there was nothing wrong with it. The department "agree[d] to disagree" and said Bennie could go ahead with any meetings he had scheduled.

Herstein, the assistant director, then received another mailing from Bennie, this one about a seminar on retirement income, which he also gave to Griess to review. Griess determined the seminar mailing was "a classic example" of a noncompliant advertisement and alerted LPL. LPL agreed the seminar mailing lacked required disclosure, but explained the senior analyst had approved it because she mistakenly thought it would be printed on letterhead containing the missing information. Herstein and Griess decided to "keep this in a reserve file and move on." Herstein added "hopefully [Bennie] will eventually hang himself along with LPL." That was in March 2010.

LPL fired Bennie at the beginning of November 2010. At that point, Bennie was still active in the Tea Party movement. In mid-2011, Bennie filed a public-records request and received the department's internal communications regarding the investigations in 2010. According to Bennie, after learning what people in the department wrote about him, he stopped arranging Tea Party events and writing letters to the editor and restrained himself from criticizing President Obama publicly.

He also pursued a media campaign against the department for harassing him, calling for the people involved to be fired and prosecuted.

Bennie then sued several department employees in their official and individual capacities. He eventually dropped all but his official-capacity claims against Griess, Herstein, and Munn (collectively, the state regulators) for First Amendment retaliation based on the department's investigation and inquiries. See 42 U.S.C. § 1983. After a bench trial, the district court found the state regulators were partly motivated by Bennie's protected speech and "[s]ome of the questions they asked of LPL would not have been asked had it not been for [Bennie's] political activity," but nonetheless ruled in the state regulators' favor because their retaliation would not have deterred an ordinary person in Bennie's position from continuing to speak. Bennie appeals. See 28 U.S.C. § 1291 (appellate jurisdiction).

## II.  DISCUSSION

Before addressing the merits of Bennie's appeal, we dispose of three threshold issues raised by the state regulators. First, the remedy Bennie asks for—a declaratory judgment and injunctions against future retaliation—is the sort of prospective relief that can be sought in federal court from state officials sued in their official capacities, notwithstanding the state's sovereign immunity, under Ex Parte Young, 209 U.S. 123 (1908). See, e.g., Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient."); Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1338 (11th Cir. 1999) (concluding the requirement of "an ongoing and continuous violation of federal law" is satisfied "where there is a threat of future enforcement that may be remedied by prospective relief").

Second, the state regulators' "'voluntary cessation'" of their improper inquiries did not moot Bennie's case because the department still has regulatory authority over him and the state regulators' assurances that they know better than to retaliate against

him again are not enough to make it "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 609 (2001) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000)).

Third, the state regulators are mistaken that Bennie's requested injunction would be unenforceable and "provide[] no relief" because "[t]he Department is already obligated to follow the law." True, "an injunction which does little or nothing more than order the defendants to obey the law is not specific enough." Daniels v. Woodbury County, 742 F.2d 1128, 1134 (8th Cir. 1984). Yet that does not mean a court cannot enjoin acts that are already illegal, as the state regulators think. Rather, the point is that an injunction cannot be too vague and must give "fair and precisely drawn notice of what the injunction actually prohibits." Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd., 824 F.2d 665, 669 (8th Cir. 1987); see also Fed. R. Civ. P. 65(d)(1)(C). An injunction against making inquiries or taking regulatory actions based on Bennie's protected expression of his political views would be sufficiently specific for the state regulators to know what they were not allowed to do. Cf. Power v. Summers, 226 F.3d 815, 819 (7th Cir. 2000) ("The term 'retaliation' is not so vague that a defendant enjoined from retaliating against a person for exercising his right of free speech would not know what he could and could not do with reference to that person.").

We proceed to the merits. To establish his First Amendment retaliation claim, Bennie needed to show three things: "(1) he engaged in a protected activity, (2) the government official[s] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004). The first element is not disputed. The second is the focus of this appeal. The third we need not reach.

-7-

### A.    Standard of Review

The initial question is what standard we apply to review the district court's conclusion that the state regulators' actions against Bennie would not have chilled an ordinary person's speech.  The standard of review applied here likely is dispositive. Bennie says the district court held the adverse acts he alleged were insufficient as a matter of law, which "is necessarily a legal conclusion" subject to de novo review. At first glance, the district court's reference to the retaliation as "de minimis" appears to bear out Bennie's characterization.  But on closer review the context demonstrates the district court used the term not to denote a legal ruling, but rather to encapsulate the factual finding that, on the evidence presented, the state regulators' actions were "insufficiently substantial" to be actionable.[2]  Cf. Bell v. Johnson, 308 F.3d 594, 603 (6th Cir. 2002) ("[I]n most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law.").  We therefore review that finding for clear error, reversing "if upon a review of the entire record [we] form[] 'the definite and firm conviction that

---

[2]Bennie identifies two conceptually distinct issues "imbedded" in the district court's conclusion: what the state regulators did and whether it was chilling enough. He argues that while the first issue is factual, the second—the part he challenges—"is best viewed as a legal question."  We disagree.  Except when the alleged harassment is so inconsequential that even allowing a claim "'would trivialize the First Amendment,'" Naucke v. City of Park Hills, 284 F.3d 923, 928 (8th Cir. 2002) (quoting Bloch v. Ribar, 156 F.3d 673, 679 (6th Cir. 1998)), which was not true here, the determination of whether government action would chill an ordinary person's speech is a matter for the factfinder.  Cf. Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) ("Ultimately, this sort of question is usually best left to the judgment of a jury, twelve ordinary people, than to that of a judge, one ordinary person.  The jury, after all, represents the conscience of the community.  It decides many similar questions—for example, what would a person of ordinary prudence have done in certain circumstances?").

a mistake has been committed.'"[3]  Ridgway v. United Hosps.-Miller Div., 563 F.2d 923, 927 (8th Cir. 1977) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)); see also Fed. R. Civ. P. 52(a)(6); Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) ("This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.").

---

[3]At oral argument, Bennie for the first time invoked the rule that "[a]n appellate court's review . . . is unique in the context of a First Amendment claim," requiring "'an independent examination of the whole record.'"  Doe v. Pulaski Cty. Special Sch. Dist., 306 F.3d 616, 621 (8th Cir. 2002) (en banc) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)).  We normally "do not consider arguments first raised at oral argument."  United States v. Johnson, 710 F.3d 784, 787 n.1 (8th Cir. 2013).  Because such independent review has been called "a constitutional duty," Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc., 515 U.S. 557, 567 (1995), we further explain the issue presented here is not whether Bennie's speech was protected by the First Amendment—no one disputes it was—but the deterrent effect of the state regulators' actions, which is not the sort of finding that might trigger such a duty.  See Pulaski Cty. Special Sch. Dist., 306 F.3d at 621 ("[A]n independent review of the facts is not necessarily a de novo review of all the facts relevant to the ultimate judgment rendered."); cf. Hurley, 515 U.S. at 567 (describing the "obligation" as "decid[ing] for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection"); Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 505-10 (1984) (surveying questions on which the Supreme Court has considered independent review appropriate); N.Y. Times Co., 376 U.S. at 285 ("In cases where that line [between protected and unprotected speech] must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.'" (quoting Pennekamp v. Florida, 328 U.S. 331, 335 (1946))).

**B.      Chilling Effect**

In essence, what Bennie challenged was the state regulators taking a marginally increased interest in his business for a little over a month and discussing his political speech with LPL.  Bennie worked in a heavily regulated and closely overseen industry, and his unorthodox advertising approach already had put him on the department's radar, and the state regulators already had contacted LPL about him, before Griess read what Bennie had to say about President Obama.  The other alleged acts of retaliation—the state regulators talking to LPL about Bennie and asking about closer supervision or other internal sanctions, making LPL temporarily stop Bennie from meeting with certain potential clients, and suggesting LPL or Bennie could face further undefined "administrative action"—largely arose out of the state regulators' scrutiny of Bennie and the rule violations (or what the state regulators thought were violations) they discovered through that scrutiny.[4]  Further, except for the order demanding Bennie's scheduled dinner meetings "**be cancelled immediately**" (emphasis in original), Bennie did not show the state regulators' actions directly affected him or his business in any way.

To be sure, "the threat"—not to mention the reality—"of continued and heightened regulatory scrutiny" sometimes can have a chilling effect, regardless of whether it ultimately results in sanctions being imposed.  Blankenship v. Manchin, 471 F.3d 523, 532 (4th Cir. 2006); see also Garcia, 348 F.3d at 729 (referring to "engag[ing] the punitive machinery of government in order to punish [the plaintiff] for her speaking out").  The increased attention from the department undeniably

---

[4]This is not to suggest that because the state regulators were ostensibly doing their jobs and for the most part did not directly target Bennie's political speech in their investigations, they were somehow justified in, as the district court found, "looking for reasons to go after" Bennie.  See Cody v. Weber, 256 F.3d 764, 771 (8th Cir. 2001) ("Conduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason.").

affected LPL—not the least by necessitating the expenditure of time and money responding to questions about Bennie—and thus had the potential to harm Bennie indirectly by turning his employer against him.[5]  However, while the record in this case might well have supported a conclusion that an ordinary person's speech would have been chilled, it did not compel such a finding.  See Anderson, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Bennie marshals case law in an attempt to counter this point, but it is largely inapposite.  The cases Bennie cites, from this court and others, arise in different procedural postures and thus answer a different question than is presented here.  Specifically, Bennie relies on decisions saying dismissal on the pleadings or summary judgment was not appropriate because government conduct that more or less resembles what the state regulators did—"closer regulatory scrutiny and threats of sanctions," in Bennie's words—*could* support finding an ordinary person would be chilled.  See, e.g., L.L. Nelson Enters., Inc. v. County of St. Louis, 673 F.3d 799, 809 (8th Cir. 2012); Blankenship, 471 F.3d at 530-33; see also Garcia, 348 F.3d at 729 (reversing the district court's grant of judgment notwithstanding a verdict finding liability).  Yet that unremarkable proposition, which we by no means question, does not imply the much stronger conclusion that a reasonable factfinder presented with the record in this case *must* find a sufficient chilling effect.[6]

_____

[5]As it happened, LPL apparently stood by Bennie and was able to appease the state regulators by implementing a previously planned reorganization of its system of review, but that is beside the point.  What matters is what the state regulators did, not how LPL responded.

[6]The state regulators' reliance on Williams v. City of Carl Junction to claim that "evidence of repeated regulatory action against a defendant, . . . as a matter of law, . . . may not be sufficient to chill a person of ordinary firmness" is equally misplaced.  In Williams, before reaching the ordinary-firmness issue, this court concluded all but one of the municipal citations the plaintiff claimed were retaliatory

-11-

The parties devote much of their arguments about this issue to the question of whether Bennie's speech was in fact chilled. The district court's analysis likewise centered on finding Bennie was not chilled until after LPL fired him, which, the district court found, was not the state regulators' fault. Although it is true that "how [a] plaintiff acted might be evidence of what a reasonable person would have done," the ordinary-firmness inquiry is at bottom "an objective one, not subjective." Garcia, 348 F.3d at 729. This case illustrates some of the dangers of giving undue weight to how a particular plaintiff actually responded to government retaliation, rather than how a hypothetical reasonable person would have reacted.

In particular, the question of whether Bennie's speech was chilled, and by what, is complicated by the fact that although Bennie suspected the department's inquiries were politically motivated, he did not get confirmation of the connection between his comments about the President and the increased scrutiny until he filed his records request over a year later. That he "continued his political activity unabated" for a while in the meantime, as the district court found, proves little. Further muddying the water, by the time Bennie learned what happened he also had lost his job with LPL and suffered other setbacks in his business for which he—incorrectly, for purposes of this case[7]—blamed the state regulators, making it difficult to isolate the additional chilling effect, if any, of what the state regulators actually did. Bennie was by all indications unusually resilient and determined, so

were not, so the relevant ruling in fact addressed only the single remaining citation, not "repeated regulatory action" as the state regulators assert. Williams v. City of Carl Junction, 480 F.3d 871, 877-78 (8th Cir. 2007).

[7]Bennie briefly suggests the state regulators' actions "contributed to [his] termination" by "negatively impact[ing] LPL's view of [him] and his value to the company." The district court firmly rejected the proposition that LPL's firing of Bennie "could reasonably be associated with the defendants' alleged retaliation." Even if Bennie's theory is "not unreasonable," as he insists, it falls far short of establishing the district court's finding was clear error.

whether he continued to speak, even if satisfactorily proved, could not tell us much about what a person of only ordinary firmness would have done in his position. See Bennett v. Hendrix, 423 F.3d 1247, 1252 (11th Cir. 2005) ("There is no reason to 'reward' government officials for picking on unusually hardy speakers."). Although Bennie's arguments on this point—briefly, that the district court looked for a chilling effect within too short a time-frame and should have focused on whether he continued in the particular sort of vigorous, publicized speech that drew the state regulators' attention, as opposed to political activity in general[8]—are well taken, we conclude Bennie's subjective reaction, whatever it was, is of little use in resolving this issue.

Finally, we address the suggestion in the state regulators' brief that the only thing they did wrong was "to quote Bennie's statements about the President in [the] . . . email [to LPL]."[9] Far from it. The email was certainly problematic, because it implicitly pressured LPL to curtail Bennie's speech to avoid problems with the department. The email was also evidence of a deeper problem, as the district court found: that the state regulators "were looking for reasons to go after" Bennie and

---

[8]Bennie also claims the district court wrongly required him to prove the state regulators got him fired from LPL, citing the district court's statement that "this might be a different case" if Bennie made such a showing. Bennie reads too much into that observation. In context, the district court's discussion of one way Bennie could have won does not imply the district court thought that was the only way.

[9]On this point, we also note Griess's testimony that he "would be doing a disservice not only to the people of the State of Nebraska but to [him]self" if he did not investigate Bennie after reading Bennie's comments about President Obama accompanied by the photograph of Bennie at his desk, as well as Munn's assertion, in an email to Griess, that Bennie being photographed at his desk making political comments "would be like me standing up in front of the flags and seal in my office and talking about a topic like abortion." Like the language quoted above, these statements appear to reflect a troubling misunderstanding of the—nonexistent—role that political speech by persons in regulated entities should play in the department's investigatory and enforcement activities.

"made regulatory inquiries of LPL that were motivated, to varying degrees, by the content of [Bennie's] speech." For the state regulators to allow their apparent disagreement with or even distaste for what Bennie had to say politically, or how he said it, to influence how the department treated him and his employer was wholly inappropriate—and absolutely inconsistent with the First Amendment. That inappropriate, unconstitutional conduct was wrong, regardless of whether the state regulators revealed their retaliatory motives to LPL or anyone else or whether the consequences of their actions were severe enough to be actionable in this case.

## III. CONCLUSION

We are not of a definite and firm conviction that a mistake was committed by the district court such that the district court clearly erred by finding the state regulators' actions against Bennie would not have quieted a person of ordinary firmness. Based on this standard of review, see, e.g., Anderson, 470 U.S. at 573-74, we affirm.

BEAM, Circuit Judge, concurring in part and dissenting in part.

Because I do not believe "the district court's account of the evidence is plausible in light of the record viewed in its entirety," Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985), I respectfully dissent with respect to part II.B of the court's opinion and, therefore, in its decision. I believe the district court committed a mistake in at least two respects. First, in its order the district court relied entirely on the actions of an "unusually resilient and determined" individual, ante at 12, as evidence of how a person of ordinary firmness would respond to the department's increased regulatory scrutiny. Although the district court acknowledged that "the question is not whether the plaintiff himself was deterred," it nonetheless based its reasoning entirely on Bennie's actions. Second, to the extent the district court correctly considered evidence of Bennie's actual conduct relevant to the person-of-ordinary-firmness inquiry, it neglected to account for Bennie's self-censorship at

-14-

the time he became fully aware of the department's retaliatory motivation in mid-2011. In looking to the actions of the recipient of retaliation as probative of how an ordinary person might behave, it must be the case that the recipient is *aware* of the retaliatory motivation behind the adverse action. Although Bennie knew the department was focusing on him in the spring of 2010 and suspected it was because of his political activities, it was not until mid-2011 that he knew the extent to which his political statements impelled the department's actions. In light of Bennie's resilient nature, the resulting self-censorship tends to demonstrate, if anything, that an ordinary, less resilient person would react similarly.

A correct evaluation of the record, in my view, compels a finding that the department's actions would deter a person of ordinary firmness from engaging in protected political speech. The court correctly recognizes that the department, which may suspend or revoke Bennie's registration as an agent, Neb. Rev. Stat. § 8-1103(9), raised the "issue" of Bennie's political speech, inquired as to whether LPL regulated such speech, and threatened both Bennie and LPL with "whatever administrative action deemed necessary and appropriate under its authority . . . to insure compliance." Because Bennie, and therefore a similarly situated ordinary person, is employed in a profession "heavily regulated and closely overseen" by the department, ante at 10, the chilling effect of the department's actions must be evaluated in that context. It is apparent that an agency, empowered to deprive those whom it regulates of their livelihood, could easily overcome the firmness of an ordinary, regulated person by "engag[ing] the punitive machinery of government." Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003). Bennie, as anyone else, needs to earn a living. It is unsurprising that when confronted with even "marginally increased interest" by his registering agency, ante at 10, Bennie's unusually firm resolve gave way to self-censorship after the mid-2011 records request. It is clear error, I think, not to have concluded in this case that an ordinary person would have done the same.

-15-

Additionally, it is clear, as the district court recognized, that employees at the department "were bothered by the plaintiff, in no small part because of the plaintiff's political views, or at least the manner in which he expressed those views. And that antipathy was manifested in the Department's regulatory attention to the plaintiff." I would therefore hold that the department's actions were motivated in part by retaliation against Bennie's speech and thus that each of the three elements of a First Amendment retaliation claim were satisfied here. See Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004). Although I do not believe an injunction would be useful, I would remand the case to the district court with instructions to grant Bennie declaratory judgment that the department violated his rights under the First Amendment and for a determination as to the propriety and amount of attorneys' fees and costs under 42 U.S.C. § 1988.

_____