# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-2886
_____

Randy Kinder Excavating, Inc.

*Plaintiff - Appellant*

Tricon Precast, Ltd.

*Plaintiff*

v.

JA Manning Construction Company, Inc.; Granite Re, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 12, 2018
Filed: August 7, 2018

_____

Before COLLOTON, ARNOLD, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This construction dispute arises from a government contract to build a pumping station for the purpose of managing water levels around parts of the lower White River in Arkansas. As with many large-scale projects, this venture was plagued with

delays from its inception. These delays were caused by weather events, scheduling conflicts, and other unforeseen conditions. The district court found, however, that they were not the fault of J.A. Manning Construction Co. ("Manning"), a subcontractor on the project. These facts notwithstanding, the general contractor—Randy Kinder Excavating, Inc. ("Kinder")—repeatedly threatened Manning, contending that Manning would be responsible for any fees incurred as a result of the delays. In the face of these threats, Manning continued to perform its obligations until its involvement in the project was prematurely terminated by Kinder. After this termination, Kinder sued Manning, claiming that Manning breached the contract. Manning counterclaimed, alleging wrongful termination and seeking to recover the cost of unpaid labor and materials incurred on the project prior to the termination. The district court[1] conducted a bench trial, after which it decided the matter in favor of Manning. Kinder appeals, and we affirm.

## I. Background

In June 2010, the U.S. Army Corps of Engineers (the "COE") awarded a contract to Kinder to serve as the general contractor on a project called the Grand Prairie Pump Station on the White River. Kinder's winning bid was $9,449,161, and Kinder was allotted 425 calendar days to complete the project. That same month, Kinder entered into a subcontract with Manning, under which Manning would be paid $950,000 to engineer, furnish, and install a mechanically stabilized earth wall (the "MSEW"). In brief, an MSEW is a concrete retaining wall with gaps between the panels to allow water to escape.

Although the original schedule showed a completion date of September 26, 2011, Kinder submitted revised schedules to the COE on November 18 and December

---

[1]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

8, 2010. According to these revised schedules, there were two parts of the project that needed to be completed before Manning could begin constructing the MSEW: (1) Kinder had to excavate dirt to achieve the specified starting elevation of the MSEW, and (2) pump station inlet walls had to be poured by the concrete subcontractor for the project. Manning requested to begin work on a number of occasions in 2010 and 2011, but Kinder refused each of these requests due to delays in completing these two prerequisites.

In May and June 2011, the area experienced a significant amount of rainfall, further delaying progress. As a result, Kinder did not begin its MSEW dirt work excavation until July 2011. In August of that year, the COE agreed to formally extend the completion date of the project to November 1, 2011. Manning was first able to mobilize to the project on August 16, 2011, but, at that point, Kinder still had not completed the excavation, and the concrete subcontractor had not installed the pump station inlet walls. On August 24, the COE advised Kinder that it was significantly behind schedule, and Kinder responded that the COE had overlooked significant weather events that led to excusable delays.

These extensive delays resulted in Manning not being able to use its intended supplier for the MSEW panels, so Manning then hired a company called EarthTec to construct the panels. The COE rejected EarthTec's first panels because of a variety of issues. Ultimately, Manning terminated EarthTec and, on November 8, 2011, Manning hired another company to finish the work.

Roughly two weeks after Manning arrived onsite, Ryan McLaughlin—the project manager and a part owner of Kinder—sent an email to Manning stating the following:

Clock is ticking and we are burning precious daylight. We have 8 weeks to build the walls and backfill or we are dewatering and carrying jobsite overhead all winter and spring. Tic toc tic toc.

The very next day, Kinder sent Manning a deficiency notice that stated:

As it currently stands, Manning's inability to perform work on this contract will jeopardize the required completion date on this project, force [Kinder] into liquidated damages, and cause [Kinder] to maintain its dewatering system through the summer of 2012, at which time [Kinder] would be forced to return to the job site and complete earth work.

Unknown to Manning, however, Kinder was telling the COE that weather and other issues were delaying the project into the summer of 2012. On the updated schedule submitted to the COE in October of 2011, Kinder represented to the COE that its projected date of completion was in September 2012. At the same time, Kinder was telling Manning that the MSEW needed to be completed by November of 2011 and that Kinder would seek damages from Manning if this did not occur.

By the time Manning could begin constructing the MSEW, only six days remained until the original projected date of completion of the entire project. Manning attempted to build the wall on two separate occasions thereafter, but Kinder and/or the COE claimed that Manning was failing to perform in accordance with the subcontract. Specifically, Kinder and the COE demanded that the panels be placed 0.75 inches apart, with absolutely no variance. Manning repeatedly told the COE and Kinder that the industry standard was to allow a quarter-inch variance, but the COE and Kinder refused to authorize such a variance. The relationship between the two ended when Kinder directed Manning to suspend operations on March 7, 2012, at which point Manning had constructed 27.5 feet of the 40-foot wall.

After Kinder unsuccessfully attempted to hire a number of new contractors who rejected the job because no variance was allowed, a company accepted the job and finished the MSEW. The finished, accepted product contained a number of the defects that Kinder and the COE had told Manning were unacceptable.

In October 2012, Kinder filed suit against Manning, alleging breach of contract and tortious interference. Manning answered the complaint and filed a counterclaim against Kinder alleging that Kinder wrongfully terminated the contract and committed slander. In its brief answer to Manning's counterclaim, Kinder asserted the defenses of failure to state a claim, unclean hands, waiver, laches, estoppel, duress, payment, release, and accord and satisfaction. Additionally, Kinder asserted that "Manning committed the first material breach of the contract" and that Kinder's "alleged failure to perform . . . was legally excused by Manning's failure to perform its express and implied obligations under the Subcontract." Manning filed a motion for partial summary judgment, arguing that Kinder's extended-performance costs claim was precluded because Manning was not responsible for the performance delays on the project and Kinder had already been compensated for those delays. The district court denied this motion on November 18, 2016, finding that issues of material fact remained as to whether Manning was responsible for the delays.

Ten days later, a bench trial began before the district court. During the five-day trial, the parties and their experts testified extensively about the factual issues surrounding the construction delays, alleged deficiencies in Manning's panels, and industry standards for constructing MSEWs. From this evidence, the district court reached the following conclusions relevant to this appeal. First, it held that Kinder, rather than Manning, committed the first material breach of contract. Next, it concluded that Kinder materially breached the contract by wrongfully terminating Manning's performance. Finally, it noted that any of the alleged deficiencies in Manning's work were not material breaches of the contract and that Manning had substantially performed its obligations. As a result, the court awarded Manning

$215,578.24, which represented Manning's cost for unpaid labor and materials incurred prior to the date of termination.

## II. Discussion

"Following a bench trial, we review the district court's legal conclusions de novo and its factual findings for clear error." PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Tr., 782 F.3d 976, 979 (8th Cir. 2015). On appeal, Kinder assigns three points of error to the district court's judgment. Kinder initially contends that Manning committed the first material breach of contract. Next, Kinder asserts that the district court erroneously concluded that Kinder wrongfully terminated the contract. Finally, Kinder argues that the evidence presented to the district court was insufficient to support the damages award. We address each in turn.

### A.

Kinder's primary argument is that the district court erred in concluding that Kinder committed the first material breach of contract. On this point, the district court found that "Kinder first breached the subcontract with Manning by threatening to assess delay-related damages without any justification; interfering in the relationship between Manning and EarthTec; and[] failing to provide adequate assurances that Manning would be paid for its work on the MSE Wall." Kinder attempts to counter these findings by arguing that the first breach actually occurred when Manning failed to pay its suppliers or failed to obtain "stamped" shop drawings for the MSEW.[2] Even assuming that Manning's failure to pay suppliers occurred prior to Kinder's threats,

[2]The failure to obtain stamped drawings occurred after Kinder had already begun making threats, so this argument necessarily fails.

the district court determined that the threats were the first *material* breach.  Kinder fails to cast doubt on that conclusion.[3]

Under Missouri law,[4] "[t]he materiality of a breach is a question of fact."  Matt Miller Co. v. Taylor-Martin Holdings, LLC, 393 S.W.3d 68, 88 (Mo. Ct. App. 2012). As such, we review the district court's finding that Kinder committed the first material breach for clear error and will reverse only "if upon a review of the entire record [we] form [] the definite and firm conviction that a mistake has been committed."  Bennie v. Munn, 822 F.3d 392, 398 (8th Cir. 2016) (alterations in original) (internal quotation marks omitted), cert. denied, 137 S. Ct. 812 (2017); Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

_____

[3]We pause for a moment to address Kinder's odd strategy on appeal.  According to Kinder, "[t]his case hinges upon a determination as to which party, Kinder or Manning, first breached the subcontract."  Appellant's Reply Br. 1.  It therefore is unsurprising that Kinder has devoted the overwhelming majority of its arguments to discussing who breached first.  For argument's sake, however, suppose that Manning did commit the first material breach when it failed to pay a supplier at some point between July and November of 2011.  Are we to ignore the fact that the parties continued their respective performances for at least four more months after such alleged breach?  Given Missouri's adherence to the general rule that a party waives the ability to object to a breach by continuing to accept the benefits of a contract, see Guidry v. Charter Commc'ns, Inc., 269 S.W.3d 520, 531 (Mo. Ct. App. 2008), Kinder lost the right to assert that breach as an affirmative defense, see Restatement (Second) of Contracts § 246.  Additionally, even where it is timely asserted, the first-to-breach rule simply allows the non-breaching party to discontinue performance and seek damages.  See Pepsi Midamerica v. Harris, 232 S.W.3d 648, 655-56 (Mo. Ct. App. 2007).  Because this argument was not developed in the record before us, however, we opt to consider what Kinder actually asserts in its brief.

[4]Both parties agree that Missouri law controls pursuant to a choice-of-law clause in the subcontract.

Missouri applies the "first to breach" rule, under which "a party to a contract cannot claim its benefit where he is the first to violate it." Barnett v. Davis, 335 S.W.3d 110, 112 (Mo. Ct. App. 2011) (internal quotation marks omitted). The "determination of the first to breach does not end the analysis, however, as only a material breach may excuse the other party's performance." R.J.S. Sec., Inc. v. Command Sec. Servs., Inc., 101 S.W.3d 1, 18 (Mo. Ct. App. 2003). To determine whether a failure in performance is "material," Missouri courts are guided by the five factors presented in the Restatement (Second) of Contracts:

> [T]he following circumstances are significant:
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Id. (quoting Restatement (Second) of Contracts § 241).

Given Kinder's assertion that Manning's failure to pay its invoices was the first material breach, we examine the situation in light of the considerations from Restatement § 241.[5] The first two factors weigh against a finding of materiality

[5]For the sake of this argument, we make several assumptions in Kinder's favor. First, we assume Manning did, in fact, fail to pay at least one supplier. Second, we assume this failure is actually a breach of Manning's subcontract with Kinder. Third, we assume this breach pre-dated Kinder's threats, as would be necessary to show that the district court clearly erred in determining that the threats were the first material breach.

because Kinder was not deprived of any benefit by Manning's alleged failure to pay its suppliers. The entity injured by any alleged failure to pay were the suppliers themselves. Because it is undisputed that the materials purchased by Manning were delivered and incorporated into the project, Kinder suffered no deprivation. Additionally, there can be no failure in adequate compensation to Kinder given that it was not deprived of a benefit.

The third factor is a little less certain, but it likewise weighs against a finding of materiality because Manning would, in fact, forfeit quite a lot if its failure to pay the invoices is treated as material. Where, for example, goods are specifically made for a particular buyer, a seller would be forced to forfeit the goods if the contract were cancelled because the seller would be unable to resell those goods to another buyer. Cf. Restatement (Second) of Contracts § 241, comment d. Here, the only reason Manning had taken on these debts was to perform its contract with Kinder, so a cancellation of the Manning-Kinder contract would leave Manning owing money to these suppliers for non-fungible items. The fourth and fifth factors also weigh against Kinder's argument. Kinder points to no evidence in the record that suggests Manning refused to perform or was, in any way, operating in bad faith. By contrast, the evidence suggests that Manning was attempting to perform its duties under the subcontract notwithstanding Kinder's incessant threats. Moreover, these threats were the driving force behind Manning's failure to pay the invoices, which suggests that Manning would have paid the invoices as soon as it received assurances that it would be paid.

Mindful of the deferential standard of our review, we believe that the Restatement factors show quite clearly that Manning's failure to pay its invoices was not a material breach of the subcontract. At the very least, however, Kinder's argument fails to show that the district court's conclusion was clearly erroneous.

Kinder next launches a factual argument with the apparent goal of showing that the three actions on which the district court focused—"threatening to assess delay-related damages without any justification; interfering in the relationship between Manning and EarthTec; and[] failing to provide adequate assurances that Manning would be paid for its work on the MSE Wall"—were not breaches of the contract. Kinder first states that "[t]hreatening to assess delay-related damages without any justification was not a breach," but the substance of its argument contends only that such threats were justified because Manning was failing to comply with Kinder's scheduling demands. Kinder completely fails to acknowledge, however, that Manning, through no fault of its own, was prevented from beginning work until more than one year after it was originally supposed to. It therefore would have been impossible for Manning to perform according to the timelines contained in the early schedules. Moreover, Manning was, in fact, performing in accordance with the timeline contained in the schedule that Kinder sent to the COE in October 2011, which stated that Manning should be finished with the MSEW in the summer of 2012. As a result, this argument fails.

Kinder next asserts that the district court clearly erred because Kinder did not have any interaction with EarthTec until after EarthTec submitted a claim to Kinder alleging that Manning had not paid its bills. As a result, Kinder concludes that this interaction could not be the first breach because it occurred after Manning failed to pay its invoices. But we have already concluded that Manning's failure to pay its suppliers was not a material breach of the contract with Kinder, so this argument likewise fails.[6]

_____

[6]Kinder also asserts that Manning was not entitled to adequate assurances because it had not committed an anticipatory repudiation. Having found sufficient justification for two of the three conclusions reached by the district court, we need not address its ruling on this issue.

-10-

Kinder fails to show that the district court clearly erred in concluding that Kinder committed the first material breach of contract.

B.

Kinder next argues that the district court incorrectly found that Kinder wrongfully terminated the contract. Kinder begins from the premise that the district court's conclusion rested on its finding that the COE "was unreasonable and arbitrary in the manner in which it interpreted the Project specifications, thereby creating a standard/specification that was not constructible by Manning." From this, Kinder surmises that the court's reasoning was that "Kinder wrongfully terminated Manning when Manning could not satisfy the [COE's] interpretation of the specifications despite having an uncontroverted contractual obligation to do so." Appellant's Br. 47. This uncontroverted obligation, according to Kinder, arises from a principle stated in the Federal Acquisition Regulations (FAR) that a contractor must "proceed diligently with performance of [a] contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer." FAR § 52.233-1(i). Kinder continues, asserting that "Manning was in breach when it elected not to perform and argue [sic] that it was being treated unfairly by the Corps." Appellant's Br. 48. Then comes the crux: "A subcontractor cannot pursue a claim against the federal government in its own name because it does not have privity of contract with the government." Appellant's Br. 48. Thus, Kinder concludes that Manning cannot assert this "pass-through claim . . . against Kinder for the improper scrutiny and improper rejections by the [COE]." Appellant's Br. 48.[7]

---

[7]The first mention of this argument came in Kinder's post-trial brief. Given the substance of the argument, it appears to fall into the category of an affirmative defense to Manning's counterclaim. As a result, Kinder's failure to include this defense in response to Manning's counterclaim likely resulted in a waiver of this defense. See Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party *must* affirmatively state

This argument completely ignores the evidence that Manning did, in fact, continue performing up to the time that Kinder directed Manning to suspend operations. Kinder repeatedly asserts that Manning should have continued its work and sought redress when the project was finished, but it never once explains how Manning could have done so in light of the fact that Kinder expressly ended Manning's involvement with the project. Manning therefore never "elected not to perform." To the contrary, Kinder terminated Manning and then filed suit against Manning to recover damages. At that point, Manning counterclaimed *against Kinder* asserting that *Kinder* wrongfully terminated the contract. The action at issue is not the COE's scrutiny of Manning's work but Kinder's decision to terminate Manning. The district court agreed that the termination was a breach of the contract, awarding Manning the costs of the labor and materials it had expended up to the point of termination. Perhaps Kinder could have contested the district court's conclusion on this issue by asserting, for example, that Kinder was justified in terminating Manning, which in turn would have required us to examine whether Manning's performance fell short of that required by the contract.[8] Instead, Kinder cites only cases concerning the FAR and argues, in substance, that Manning failed to follow the proper procedures for bringing a claim against the government. This argument does nothing to refute the district court's conclusion that Kinder breached the contract when it terminated Manning's performance.

---

any avoidance or affirmative defense . . . ." (emphasis added)); 5 Charles Alan Wright, et al., Federal Practice and Procedure § 1394 (3d ed. 1998) ("It is evident from a reading of the text of Rule 8(c), Rule 8(d), and Rule 12(b) that all affirmative defenses and denials must be pleaded by the defendant or, when appropriate, raised by motion under Rule 12(b), or they will be waived."). Still, we briefly consider the argument on the merits given some uncertainty in this classification.

[8]As noted in the previous section, Kinder did raise an argument that it was justified in *threatening* Manning. These threats, however, are a distinct act from Kinder's *termination* of Manning's performance.

## C.

Kinder's final argument is that the evidence at trial did not support the damage award. The amount of damages is a question of fact, see High Life Sales Co. v. Brown-Forman Corp., 823 S.W.2d 493, 502 (Mo. 1992), so our review is for clear error, PHL Variable Ins. Co., 782 F.3d at 979. "Damages for breach of contract are limited to the loss of the benefit itself," with the goal of placing the wronged party "in the position he would have been in had the contract been performed." Overcast v. Billings Mut. Ins. Co., 11 S.W.3d 62, 67 (Mo. 2000). "Damages are not recoverable for loss beyond an amount that the evidence establishes with reasonable certainty, but not absolute certainty." Harvey v. Timber Res., Inc., 37 S.W.3d 814, 819 (Mo. Ct. App. 2001). "'Certainty' means that damages have been suffered and not exact proof of the amount of the damages." Best Buy Builders, Inc. v. Siegel, 409 S.W.3d 562, 565 (Mo. Ct. App. 2013). A party has "the burden of presenting a basis for a rational estimate of damages without resorting to speculation," but the specific amount of damages is committed to the discretion of the factfinder. Id. "Where the fact of damage is clear, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court." Harvey, 37 S.W.3d at 819-20.

Although the evidence could certainly have been stronger, we believe Manning's testimony provided a reasonable basis upon which to award damages. Manning testified that it had completed 27.5 vertical feet of the 40-foot wall (about 69%) and that the company had spent $215,578.24 in labor and materials at the time Kinder directed Manning to suspend performance. This figure represents an amount that "may reasonably be supposed to have entered into the contemplation of the parties," in contrast to "speculative profits or accidental or consequential losses, or the loss of a fancied good bargain." Guidry, 269 S.W.3d at 533 (internal quotation marks omitted). The district court did not clearly err in awarding $215,578.24 to Manning for the work it had performed prior to the point it was terminated.

-13-

## III.

For the foregoing reasons, we affirm the judgment of the district court in its entirety.

_____